# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| Heather Patterson d/b/a Prestige Towing; Kathleen Byrnes; and WAYPOINT RESIDENTIAL, LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br><br>v.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; EXPAND ENERGY CORPORATION f/k/a CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; PIONEER NATURAL RESOURCES COMPANY; SCOTT D. SHEFFIELD, and individual; and JOHN B. HESS, an individual,<br><br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

i

## TABLE OF CONTENTS

I.   NATURE OF ACTION ................................................................................................. 1

II.  PARTIES .................................................................................................................... 6

   A.  Plaintiffs ............................................................................................................. 6

   B.  Defendants .......................................................................................................... 7

III. JURISDICTION, VENUE, AND COMMERCE .................................................. 10

IV.  FACTUAL ALLEGATIONS .................................................................................. 12

   A.  Organization of the Petroleum Exporting Countries ("OPEC") ....................... 12

   B.  "Cowboyistan" Establishes a "New Oil Order" ................................................ 13

   C.  The 2014-2016 "OPEC Price War" .................................................................. 16

   D.  If You Can't Beat 'Em: Cowboyistan Takes a Seat at the "Table on Pricing" ............... 18

   E.  2021: Defendants Actualize Their Agreement with OPEC ............................... 28

   F.  2022-2023: $200 a barrel? No Thanks .............................................................. 36

   G.  Defendants' "Restraint" Is Economically Irrational, Absent Agreement ........................ 51

V.   POST-FILING REGULATORY ACTIVITY ......................................................... 54

   A.  Exxon-Pioneer Merger ...................................................................................... 54

   B.  Chevron-Hess Merger ........................................................................................ 57

VI.  PLUS FACTORS ...................................................................................................... 59

VII. ANTITRUST INJURY ............................................................................................ 63

   A.  Organization of the U.S. Petroleum and Gasoline Industry ............................. 63

   B.  Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Crude Oil Throughout the Class Period ............................................................. 70

   C.  Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Gasoline and Diesel Fuel Purchased by Plaintiffs and the Classes ......................... 73

   D.  Defendants' Agreement to Constrain Shale Oil Production Has Also Inflated the Price of the Other Crude Oil Derivative Fuel Products Purchased by Plaintiffs and the Class ............ 77

      1.  Marine Fuel ................................................................................................. 77

      2.  Heating Oil .................................................................................................. 78

      3.  Jet Fuel ........................................................................................................ 79

VIII. CLASS ACTION ALLEGATIONS ........................................................................ 81

IX.  CLAIMS FOR RELIEF ........................................................................................... 83

   A.  VIOLATION OF THE SHERMAN ACT .......................................................... 84

   B.  VIOLATIONS OF STATE ANTITRUST LAWS .............................................. 85

X.     PRAYER FOR RELIEF ................................................................................... 106

XI.     JURY TRIAL DEMANDED ........................................................................ 107

Plaintiffs Heather Patterson d/b/a Prestige Towing, Kathleen Byrnes, and Waypoint Residential, LLC, individually and on behalf of all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and/or other relief as appropriate, based on violations of the Sherman Act and numerous state antitrust and consumer protection laws by Permian Resources Corporation f/k/a Centennial Resource Development, Inc.; Expand Energy Corporation f/k/a Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; Pioneer Natural Resources Company; Scott D. Sheffield; and John B. Hess.

## I.    NATURE OF ACTION

1.    This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production, which has had the effect of fixing, raising, and maintaining the price of crude oil, and thereby the price paid by end-users of oil-derivative products, including but not limited to gasoline, distillate fuel (including diesel fuel home heating oil), marine fuel, and jet and aviation fuel ("jet fuel", and together "crude oil derivative fuel products") in and throughout the United States of America.

2.    Shale oil, also called "tight oil," is a high-quality crude oil found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, home heating oil, and other commercial products sold in the U.S.

3.    Shale oil is produced by fracturing the rock formations that contain the layers of oil in a process known as hydraulic fracturing, or "fracking." Today, shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.

4.    "The U.S. Energy Information Administration (EIA) estimates that in 2022, about 2.84 billion barrels (or about 7.79 million barrels per day) of crude oil were produced directly from

tight-oil resources in the United States. This was equal to about 66% of total U.S. crude oil production in 2022." *How Much Shale (Tight) Oil is Produced in the United States?*, U.S. ENERGY INFO. ADMIN. (last updated Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6. Crude oil supply is measured by the number of "barrels" produced, each of which contains 42 gallons of crude oil. Daily oil production is measured in barrels per day, which is at times abbreviated as bpd, but is also b/d or B/D. Production over longer periods is often measured in millions of barrels, abbreviated as MMbbl.

5.      Shale oil, along with other crude oil, is sold to refineries. Refineries co-mingle shale oil produced by Defendants with other shale oil, as well as with crude oil extracted via traditional drilling methods, then refine the crude oil into gasoline and other petroleum-based products. Crude oil is the primary upstream input in gasoline, diesel fuel, marine fuel, home heating oil, and myriad other crude oil derivative fuel products.

6.      After refining, crude oil derivative fuel products take similar, but distinct, routes to end users:

    a.      Gasoline: Once refined, gasoline is transported to storage terminals, where it is stored and blended prior to sale to end-users or gas stations for onward sale to other members of the Classes. Gasoline is a critical commodity for American consumers. Approximately 40 million Americans fill up their vehicles every day at American gas stations.[1] Gasoline purchases account for approximately 5% of U.S. consumer household spending per year, with the average car using approximately 500 gallons of gasoline each year.[2]

---

[1]     *Factors that impact gas prices*, NACS (Apr. 05, 2023), https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon.

[2]     Jeff Lenard, *Who Makes Money Selling Gas?*, NACS (Nov. 12, 2021), https://www.convenience.org/Media/conveniencecorner/Who-Makes-Money-Selling-Gas.

b.  Distillate Fuels - Diesel Fuel and Home Heating Oil:  Diesel fuel and heating oil are virtually identical in terms of chemical composition, though heating oil is dyed red to denote its tax-free status.  While diesel fuel generally follows the same path to the end user as gasoline, home heating oil is usually transported by rail or barges from refineries to large storage facilities.  From there, heating oil is then transported to smaller storage tanks for sale to end users, who typically have their heating oil delivered by truck directly to their home or business. Approximately five million households across the United States, mostly in the Northeast, use heating oil to heat their homes.[3]

c.  Marine Fuel:  Marine fuel is sold at a fuel dock for commercial and personal uses in boats.  Marine fuel includes gasoline that is essentially identical to that sold at terrestrial gas stations, gasoline specially formulated for marine use, diesel that is essentially identical to that sold in terrestrial gas stations, and "red-dye" diesel (denoting the latter's tax-exempt status).  After refining and blending, marine fuel is transported from storage terminals to fuel docks via trucks, pipelines, and barges.  Fuel docks are often located on municipality-owned docks and marinas and are generally serviced by different companies than those that service and/or operate terrestrial gas stations.  Fuel consumption for marine uses represents a significant volume of the total fuel consumption in the United States.  The U.S. Department of Energy estimates that in 2021 boats and ships used approximately 4.6% of the energy dedicated to transportation in the United States, a figure that includes marine fuel.  The Bureau of Transportation Statistics reports that marine uses of gasoline, in particular, account for more than two billion gallons per year since 2015.

---

[3]  *Heating Oil Explained – Use of Heating Oil*, U.S. ENERGY INFO. ADMIN. (last updated June 13, 2024), https://www.eia.gov/energyexplained/heating-oil/use-of-heating-oil.php.

d.     Jet Fuel: Jet fuel is a kerosene-based fuel product meeting the requirements of the applicable ASTM International specification (*e.g.*, composition, volatility, fluidity, combustion, corrosion, thermal stability, contaminants, additives).  Jet fuel is derived from crude oil and used to power aircraft with jet, turbine, and turboprop engines – essentially all modern aircraft across commercial, military, and recreational aviation.  Like diesel fuel and gasoline, jet fuel is created by refining crude oil.  Jet fuel represents less than 10 percent of U.S. refinery yield, but could be as much as 25 percent or more at a specific refinery depending on the refinery's configuration and source of crude oil.  After it is refined, jet fuel is transported to storage terminals, where it is stored and blended, then sold to refuelers.  Jet fuel purchasers in the U.S., like certain Plaintiffs and members of the Classes, purchase jet fuel at airports.

7.     United States shale producers ("Shale Producers") are companies that primarily focus on the exploration, development, and production of domestic shale resources.  These companies are distinct from large vertically integrated energy companies, like British Petroleum and the Shell companies (known as "supermajor(s)"), with diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources.

8.     Defendants Permian Resources Corp. f/k/a Centennial Resource Development ("Centennial"), Expand Energy Corporation f/k/a Chesapeake Energy Corporation ("Chesapeake"), Continental Resources Inc. ("Continental"), Diamondback Energy, Inc. ("Diamondback"), EOG Resources, Inc. ("EOG"), Hess Corporation ("Hess"), Occidental Petroleum Corporation ("Occidental"), and Pioneer Natural Resources Company ("Pioneer"), collectively "Defendants," are among the largest independent domestic Shale Producers.[4]

---

[4]     As further described below, during the Class Period, Defendants Sheffield and Hess were the CEOs of Defendants Pioneer and Hess, respectively.

Independent Shale Producers traditionally acted as "swing producers" for the global oil market, with the ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.

9.      The U.S. experienced record-high crude oil prices beginning on or around January 2021, continuing through the present.  Basic principles of supply and demand dictate that in their role as swing producers, Defendants should have increased production to capitalize on this price rise.  Instead, Defendants collectively decided not to increase their U.S. shale oil production.

10.      Defendants' agreement is complimented by their cooperation and collusion with the Organization of the Petroleum Exporting Countries ("OPEC"), the international cartel of large oil producing nations, that also sought to raise oil prices by limiting oil production during this period.

11.      Between 2017 and 2023, Defendants met and communicated regularly with each other, and with OPEC, to coordinate their collective oil output.  Following these meetings, representatives from Defendants consistently made public statements confirming these discussions and the exchange of confidential information.  Specifically, Defendants also confirmed that they discussed with each other and OPEC their production strategies, future investment plans, and price targets.  Likewise, when publicly discussing their meetings with Defendants, OPEC officials praised the cooperative nature of their developing relationship with Defendants.

12.      From the time when the meetings between U.S. Shale Producers and OPEC began in 2017 until the onset of the COVID-19 pandemic, worldwide oil prices and supply remained relatively stable.  In the early days of the COVID-19 pandemic, gasoline and other crude oil derivative fuel product demand dropped precipitously, sending a shockwave through the oil supply chain.

13.      Gasoline demand, and thereby oil prices, recovered and ultimately began increasing at a rapid rate in 2021.  The increase in the price of crude oil following the COVID-19 pandemic

was exacerbated by the Russian invasion of Ukraine in late February 2022, which led to sanctions that largely sequestered Russian oil from the global market.  This extended run of historically high crude oil prices provided prime market conditions for agile swing producers like Defendants – whose breakeven prices have never been lower and who operate in regions with a wealth of profitable opportunities – to aggressively increase production and steal market share.

14.    But Defendants did not take advantage of this market opportunity.  Rather, departing from their historical practice and rational independent self-interest, each Defendant limited their domestic shale production growth.

15.    Defendants' agreement to limit their respective shale production volumes has had the effect of fixing and/or stabilizing at an artificially high-level U.S. (and global) crude oil prices, which in turn fixed and/or stabilized crude oil derivative fuel product prices in the United States at an artificially high level.

16.    Defendants' cartel is a *per se* unlawful restraint of trade under numerous state antitrust and competition laws.  Plaintiffs are end-payors of crude oil derivative fuel products. Plaintiffs and the Classes suffered substantial harm from the supracompetitive prices they paid for crude oil derivative fuel products, including, gasoline, diesel fuel, heating oil, marine fuel, and jet fuel, as a direct and proximate result of the cartel to constrain domestic production of shale oil in the United States.  Plaintiffs bring this suit to end that harm and recover that loss.

## II.    PARTIES

### A.    Plaintiffs

17.    Plaintiff Heather Patterson is a citizen of Arkansas and resides in the city of Paragould.  Heather Patterson is the sole proprietor of Prestige Towing, a company residing in and registered in Arkansas.  Heather Patterson purchased gasoline on approximately a weekly basis in Arkansas during the Class Period for personal use. Heather Patterson, on behalf of Prestige Towing, purchased gasoline on approximately a daily basis during the Class Period for commercial

use from gas stations in Arkansas.  Heather Patterson and Prestige Towing have paid higher gas prices by reason of the allegations herein.

18.     Plaintiff Kathleen Byrnes is a citizen of Vermont and resides in the town of Shoreham.  Ms. Byrnes purchased gasoline on approximately a weekly basis in Vermont during the Class Period for personal use.  Ms. Byrnes has paid higher gas prices by reason of the allegations herein.

19.     Plaintiff Waypoint Residential, LLC is an investment firm that is registered in Florida and headquartered in Boca Raton, Florida.  During the Class Period, Waypoint Residential, LLC regularly purchased jet fuel for commercial purposes in Florida, Arizona, California, Colorado, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nevada, New York, North Carolina, Tennessee, and Utah and has paid higher jet fuel prices by reason of the allegations herein.

**B.     Defendants**

20.     Defendant Permian Resources Corporation ("Permian Resources"), known as Centennial Resource Development, Inc. or "Centennial" during the relevant period, is a Delaware corporation headquartered in Midland, Texas.  Permian Resources' common stock is listed and traded on the New York Stock Exchange under the trading symbol PR.  Permian Resources is an oil and gas company that produces shale oil in Texas and New Mexico for sale in the U.S. domestic market, where it is refined and disseminated to a variety of end users across the country.

21.     Defendant Chesapeake Energy Corporation is now known as Expand Energy Corporation, after a merger between Chesapeake Energy and Southwest Energy finalized on October 1, 2024.  Like Chesapeake Energy, Expand Energy is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma.  Expand Energy's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol EXE.  During the Class Period,

Chesapeake Energy produced shale oil in Louisiana and Pennsylvania for sale in the U.S. domestic market where it was refined and disseminated to end users across the country.

22.     Defendant Continental Resources, Inc. is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma. Continental common stock was listed and traded on the New York Stock Exchange under the trading symbol CLR until the purchase of the company by its founder Harold Hamm, on November 22, 2022, through a series of take-private transactions with Omega Acquisition Inc. Continental is an oil and gas company that acquires and processes shale oil in North Dakota, Montana, Oklahoma, Texas, and Wyoming, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

23.     Defendant Diamondback Energy, Inc. is a Delaware corporation headquartered in Midland, Texas. Diamondback's common stock is listed and traded on the NASDAQ Stock Market under the trading symbol FANG. Diamondback is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

24.     Defendant EOG Resources, Inc., is a Delaware corporation headquartered in Houston, Texas. EOG's common stock is listed and traded on the New York Stock Exchange under the trading symbol EOG. EOG is an oil and gas production company that produces shale oil in North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated across the country.

25.     Defendant Hess Corporation is a Delaware corporation headquartered in New York, New York. Hess's common stock is listed and traded on the New York Stock Exchange under the trading symbol HES. Hess is an oil and gas production company that acquires and processes shale oil in North Dakota, before selling the resulting shale oil into the U.S. domestic

market where it is refined and disseminated across the country.  Hess also sells the refined consumer gasoline across the United States.

26.    Defendant Occidental Petroleum Corporation is a Delaware corporation headquartered in Houston, Texas.  Occidental's common stock and warrants to purchase common stock are listed and traded on the New York Stock Exchange under the trading symbols OXY and OXY WS, respectively.  Occidental is an oil and gas production company that acquires and processes shale oil in Colorado, Texas, and New Mexico, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated to end users across the country.

27.    Defendant Pioneer Natural Resources Co. is a Delaware corporation headquartered in Irving, Texas.  Pioneer's common stock is listed and traded on the New York Stock Exchange under the trading symbol PDX.  Pioneer is an oil and gas production company that acquires and processes shale oil in Texas, before selling the resulting shale oil into the U.S. domestic market where it is refined and disseminated to end users across the country.

28.    Defendant Scott D. Sheffield is a resident of the Texas and the founder of Defendant Pioneer Natural Resources Co.  Mr. Sheffield was the Chief Executive Officer of Defendant Pioneer throughout the Class Period, until his retirement at the end of 2023.[5]

29.    Defendant John B. Hess is a New York resident and has been the Chief Executive Officer of Defendant Hess since 1995 and, has served as CEO during all times relevant to this Complaint.

30.    Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

---

[5]    See Liz Hampton, *US shale producer Pioneer's founder and CEO Sheffield to retire*, REUTERS (Apr. 26, 2023), https://www.reuters.com/business/energy/pioneer-natural-resources-beats-profit-estimates-ceo-step-down-2023-04-26/#:~:text=Sheffield%2C%2070%2C%20was%20Pioneer's%20founding,31%2C%20the%20company%20said.

31.    Other unnamed co-conspirators include the members of OPEC and OPEC+, as well as any other currently unknown U.S. shale producers that committed overt acts in furtherance of the conspiracy alleged herein.

32.    Where Plaintiffs ascribe an action to "Defendants," unless stated otherwise, the action is alleged to have been taken by each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer.

33.    "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

34.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.  Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

35.    At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct.  Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein.  The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of shale oil production and crude oil prices.

## III.    JURISDICTION, VENUE, AND COMMERCE

36.     This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), and Section 16 of the Clayton Act (15 U.S.C. §26), as well as the antitrust, fair competition, and consumer protection laws of various states.  This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

37.     This Court has subject matter jurisdiction over Plaintiffs' claim under Section 16 of the Clayton Act, 15 U.S.C. §26, and under 28 U.S.C. §§1331, 1333(d), 1337(a), and 1367.

38.     This Court also has personal jurisdiction over all Defendants, and venue in this District is proper, because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) has manufactured, sold, shipped, and/or delivered substantial quantities of shale oil throughout the United States, including this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.  Further, venue is appropriate in this District as a substantial portion of the conduct alleged in this Complaint occurred in, or directly affected shale oil production in, the Permian Basin, which spans Southeastern New Mexico and West Texas.

39.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States.  Defendants' products and services are sold in the flow of interstate commerce.

40.     By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states.

41.     Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the Classes.

## IV.    FACTUAL ALLEGATIONS

### A.  Organization of the Petroleum Exporting Countries ("OPEC")

42.     OPEC, an intergovernmental organization made up of nations who purport to benefit from sovereign immunity to the Sherman Act,[6] controls close to 40% of the world's oil production.  Historically, OPEC exerted market power over global oil prices through coordinating its members' respective production levels.[7]  Non-member nations historically keyed their oil production levels off OPEC's guidance to benefit from the oil prices targeted by OPEC; a classic "umbrella pricing" situation.[8]

43.     Historically, Saudi Arabia acted as OPEC's (and thereby the global) swing producer – a producer known for its ability to adjust production levels relatively rapidly in response to changes in market conditions and influence crude oil prices – leveraging its status as the member with the largest production capacity to become OPEC's de facto leader.[9]

---

[6]     Mamdouh G. Salameh, *OPEC is an Important Energy Policy Tool to Keep Oil Markets Stable*, I.A.E.E. ENERGY FORUM, Vol. 28, Issn 1944-3188 (Feb. 2019), https://www.iaee.org/documents/2019EnergyForum1qtr.pdf, at 17 (OPEC's stated mission is to "'coordinate and unify the oil policies of its member countries and ensure the stabilization of oil markets . . . .'  The organization is also a significant provider of information about the international oil market.  The current OPEC members are Algeria, Angola, Ecuador, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Qatar, the Republic of Congo, Saudi Arabia (the *de facto* leader), UAE and Venezuela.").

[7]     Anshu Siripurapu & Andrew Chatzky, *OPEC in a Changing World*, COUNCIL ON FOREIGN RELS. (Mar. 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

[8]     Salameh, *supra* n.6 ("In the 1980s, OPEC began setting production quotas for its member nations; generally, when the quotas are reduced, oil prices increase. . . .  Since the 1980s, representatives from Egypt, Mexico, Norway, Oman, and Russia and other oil-exporting nations have attended many OPEC meetings as observers.  This arrangement serves as an informal mechanism for coordinating policies.").

[9]     *Id.*

44.     In December 2016, OPEC expanded its cartel, signing the first of several agreements with 10 other oil-producing nations (most notably Russia, whose production rivaled that of Saudi Arabia) and, forming what is now known as "OPEC+."[10]

45.     This long-resisted expansion of OPEC was done out of necessity[11] – by 2014, OPEC had lost its ability to exert complete control over global oil prices, thanks to the arrival of a new global oil player: which OPEC dubbed "Cowboyistan."

**B.      "Cowboyistan" Establishes a "New Oil Order"**

46.     Fracking changed everything.  Equal parts controversial and successful upon its introduction in the early 2000s, within eight years of the first commercial shale fracking operation coming online in Texas in 2002, U.S. Shale Producers were pumping enough shale oil to reverse a 35-consecutive-year trend of declining U.S. domestic crude oil production.  The seven years starting from 2008 represented the fastest increase in domestic crude oil production in U.S. history – the "Shale Revolution."[12]

---

[10]     *Id*. at 18 (In 2017, "Saudi Arabia was forced to eventually discard its [price war with U.S. Independants] strategy and engineer with Russia an OPEC/non-OPEC production cut agreement" in an attempt to regain control of crude oil prices.  The agreement was extended through 2018 and converted into a "permanent mechanism for cooperation between OPEC and Russia in what has been dubbed as OPEC+.").  Throughout this complaint, references to OPEC from December 2016 onwards encompass OPEC+.

[11]     Guy Laron, *The OPEC+ Puzzle: Why Russian-Saudi Cooperation Starts – and Stops – with Oil Prices*, The Wilson Center (Jan. 19, 2023), https://www.wilsoncenter.org/article/opec-puzzle-why-russian-saudi-cooperation-starts-and-stops-oil-prices (despite decades of tension and bad blood between Russia and Saudi Arabia, "[t]here was no way for OPEC to deal with the growing market power of the US without cooperating with the Russians"); *see also* Harry First & Darren Bush, *The U.S. Can Take on the Oil Cartel that Enables Putin, and Win*, The N.Y. Times (June 3, 2022), https://www.nytimes.com/2022/06/03/opinion/gas-prices-russia-opec.html (Antitrust specialists have concluded that "as more countries joined or allied themselves with the [OPEC] cartel, it has only become more effective at controlling the output of what would otherwise have been competing oil producers.").

[12]     Robert Rapier, *How The Shale Boom Turned the World Upside Down*, Forbes (Apr. 21, 2017), https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/?sh=497a463b77d2.

47.     Shale production posed a unique problem for OPEC.  Unlike the supermajors, which typically invest in decades-long traditional drilling projects that require substantial lead time and infrastructure construction before production begins, shale oil wells:  (a) require smaller capital commitments; (b) can be drilled in two to four weeks;[13] (c) can be brought online within months; (d) can be shut off relatively quickly if prices fall;[14] and (e) allow for production to be comparatively front-loaded.  Consequently, production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors.  According to market analysts, "the shale sector's ability to boost production – and to scale back – relatively quickly is its calling card,"[15] which makes U.S. shale oil **"as close to inventory-on-demand as oil ever comes**."[16]

48.     But independent Shale Producers are like the supermajors in one important respect that is problematic for OPEC:  they are subject to the Sherman Act.  This means that while U.S. Shale Producers would come to produce as much oil as the largest OPEC and OPEC+ nations,[17] it was not a monolith capable of making industry-wide production decisions.  Rather, as a boon to

---

[13]    Ryan Moore, *The Numbers: The Permian Excels*, PHEASANT ENERGY (last updated Sept. 7, 2023), https://www.pheasantenergy.com/the-numbers-the-permian-excels (Defendant Pioneer, the largest acreage holder in the Midland Basin of the Permian, reported that as of 2018, it was taking Pioneer approximately 15 to 20 days to drill a well down 10,000 feet and horizontal out to 20,000 feet).

[14]    *See, e.g.*, Mamdouh G Salameh, *Saudi Arabia's Unwinnable Oil Price War Against Russia?*, INT'L ASS'N FOR ENERGY ECONOMICS, COVID-19 Issue (2020), https://www.iaee.org/en/publications/newsletterdl.aspx?id=894 ("Russian oil companies couldn't switch off production at their oilfields as easy as U.S. shale oil . . .").

[15]    Liam Denning, *Shale Companies Say They Can't Drill More.  Even When There's a War?*, BLOOMBERG (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war.

[16]    Steve LeVine, *Oil Hasn't Bottomed out, so Trade Now at Your Own Peril*, QUARTZ (Feb. 10, 2015), https://qz.com/341884/oil-hasnt-bottomed-out-so-trade-now-at-your-own-peril.

[17]    By 2018, the United States eclipsed Saudi Arabia and Russia as the largest oil producer in the world.  Devin Krishna Kumar, *U.S. expected to end 2018 as world's top oil producer: EIA*, REUTERS (Dec. 11, 2018), https://www.reuters.com/article/us-usa-oil-eia-outlook/u-s-expected-to-end-2018-as-worlds-top-oil-producer-eia-idUSKBN1OA21D.

crude oil derivative fuel product end-payors like Plaintiffs and members of the Classes, U.S. Shale Producers were a group of relatively smaller producers, bound by law to compete with each other and OPEC.

49.     So, U.S. shale's arrival on the global oil scene in the early-to-mid-2010s was a nightmare for OPEC.  The U.S. shale movement was dubbed "Cowboyistan"[18] in the industry for Shale Producers' "drill-first, ask-questions-later" business model.[19]  A "new oil order" had emerged.[20]  The aggressive competition of U.S. Shale Producers usurped the Saudi swing producer role[21] and saw U.S. domestic production erode OPEC-set cartel price premiums.

50.     This new, aggressive competition arrived as forward-looking demand projections for crude oil were softening.  Worldwide attention and recognition of the link between global temperature and climate change and carbon emissions was driving governments around the world to discuss and implement long-term policies designed to curb those emissions.  For example, in 2010, the share of new automobiles that were either fully battery powered or plug-in hybrids was less than 1%.  In 2018, it was 2%.  In 2023, that percentage was 18%.

---

[18]     Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan for U.S. Domination of Global Oil*, FORBES (Mar. 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/?sh=bc9df884ed2.

[19]     Barney Jopson, *Fracking: The Energy revolution that shook the world*, FIN. TIMES (May 6, 2015), https://www.ft.com/content/6fab1192-f30d-11e4-a979-00144feab7de.

[20]     Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[21]     Hailey Lee, *Why OPEC's Losing Its Ability to Set Oil Prices*, CNBC (Oct. 27, 2014), https://www.cnbc.com/2014/10/27/us-shale-replaces-opec-as-leading-swing-producer-goldman.html (U.S. shale's spare capacity – the amount of crude a country is able to produce in 30 days in case of an emergency – was almost four times that of Saudi Arabia's); David Livingston & Eugene Tan, *Shale's True Contribution to the Oil Market*, CARNEGIE ENDOWMENT FOR INT'L PEACE (July 9, 2015), https://carnegieendowment.org/2015/07/09/shale-s-true-contribution-to-oil-market-pub-60659 ("consensus has developed that Saudi Arabia has surrendered its role as de facto manager of the world oil market to U.S. shale oil producers" because "shale wells take less time to drill and complete than comparatively larger conventional oil projects, which require years and many millions of dollars to move from planning into first production").

51.     This combination of additional global supply from U.S. Shale Producers and forecasted slowing of worldwide demand[22] pointed to a new global oil paradigm: perpetually cheap oil.

**C.     The 2014-2016 "OPEC Price War"**

52.     Perpetually cheap and plentiful crude oil would be catastrophic for OPEC members, as sovereign nation-states with GDPs (and, in some cases, currencies) heavily reliant on crude oil prices.[23]  As such, OPEC was not about to willingly cede the pricing power OPEC had held over global oil prices for a half-century to U.S. Shale Producers.

53.     Perhaps underestimating the willingness of American companies to flaunt the Sherman Act, or perhaps the result of a rebuffed invitation(s) not yet publicly known, at some point in 2014, OPEC determined Cowboyistan could not be bought and had to go.

54.     Consequently, despite a global oversupply of crude oil, in mid-2014 OPEC made a deliberate long-term choice to maintain, rather than reduce, its production levels to win back the market share it had lost to Shale Producers, and to push oil prices to a level that would render U.S. shale oil no longer economically viable.[24]  This two-year period of open global competition, dubbed within the industry as the "OPEC Price War," had begun:

---

[22]     *See, e.g.*, Dmitry Zhdannikov and David Sheppard, *IEA sees 2015 oil demand growth much lower, supply hitting prices*, REUTERS (October 14, 2014), https://www.reuters.com/article/business/iea-sees-2015-oil-demand-growth-much-lower-supply-hitting-prices-idUSKCN0I30TC/; Grant Smith and Mark Shenk, *Oil Demand Outlook Lowered as Sub-$60 Price Seen Holding*, BLOOMBERG (December 12, 2014), https://www.bloomberg.com/news/articles/2014-12-12/iea-cuts-global-oil-demand-forecast-for-4th-time-in-five-months.

[23] *See, e.g.*, Ulrich Blum and Jiarui Zhong, *The Loss of Raw Material Criticality: Implications of the Collapse of Saudi Arabian Oil Exports*, INTERECONOMICS, 56:6 (2021) ("[A] 30% fall in oil prices would cause Saudi GDP to contract by 15%, other things being equal.").

[24]     Siripurapu & Chatzky, *supra* n.7; Javier Blas, *Wall Street is Finally Going to Make Money Off the Permian*, BLOOMBERG (Apr. 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off#xj4y7vzkg (In February 2016, Saudi Arabia's Oil Minister Al-Naimi warned U.S. shale producers, "[l]ower costs, borrow cash, or liquidate.").

**Figure 1. Daily Crude Oil Spot Prices (2010-2016)**



Source: U.S. Energy Information Administration, based on Thompson Reuters

55.    The OPEC Price War dragged on for years for two reasons.  First, shale production was a brand-new industry where technological advancements and accumulating experience was driving breakeven points lower,[25] allowing Shale Producers to exploit less productive shale plays profitably.[26]    Second, the U.S. legal structure (including corporate and bankruptcy law),

---

[25]    In the beginning of 2014, "Rystad Energy estimated the average breakeven price for tight oil to be $82 per barrel," but by 2018, the average breakeven price reported had dropped to $47 per barrel, and by 2021, $37 per barrel.  *See Rystad Energy: As falling Costs Make New Oil Cheaper to Produce, Climate Policies May Fail Unless they Target Demand*, ROGTEC MAGAZINE (Nov. 17, 2021), https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand/; Maitham A. Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, 13 INT'L J. OF ENERGY ECONS. & POLICY 4 (July 2023), https://econjournals.com/index.php/ijeep/article/view/14455 ("This continuous decrease in the break-even price of shale oil made the US shale oil industry more flexible to face fluctuations in oil prices" and "[d]espite the drop in prices from about $100 a barrel in 2014 to $64 a barrel in 2019, shale oil production has doubled by 100% during this period.").

[26]    A shale oil "play" refers to a specific geographic area or region where shale formations contain significant amounts of oil that can be economically extracted.  The top three shale oil plays in the U.S. are the Permian Basin in Texas and New Mexico (40% of all U.S. crude production in 2022), the Bakken Formation in North Dakota and Montana, and Eagle Ford in Texas.  Technological advancements have made more shale oil plays economically viable over time.

encourages business formation and risk-taking, making business failure less economically devastating to the individuals involved.[27]

56.    As a result, by implementing cost-cutting measures and focusing on the most productive shale plays to remain competitive in the lower-price environment, many U.S. shale producers, including Defendants, continued to drill at consistent levels despite the price drop caused by OPEC's Price War.[28]

57.    Yet, the OPEC price war consolidated the U.S. shale industry, causing dozens of smaller Shale Producers to fail[29] and larger Shale Producers, like Defendants, to rally together in the face of a shared adversary.

### D.    If You Can't Beat 'Em: Cowboyistan Takes a Seat at the "Table on Pricing"

58.    Weary after years of low prices,[30] OPEC changed tactics.  First, as noted above, in December 2016, it struck a deal with 10 non-OPEC oil producing nations to form OPEC+.  Having

---

[27]    Clifford Krauss, *Why $4-a-Gallon Gas May Be Coming Your Way This Summer*, THE N.Y. TIMES (Mar. 13, 2021), https://www.nytimes.com/2021/03/11/business/energy-environment/oil-prices-opec-shale.html ("But the U.S. oil industry was far more resilient than [OPEC] officials expected, and American production continued to rise as [Shale Producers] cut costs.  While many shale companies were hurt by OPEC's [price war] and oil prices never completely recovered, the economies of Saudi Arabia and other oil-dependent nations were damaged far more than the United States.").

[28]    Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production).

[29]    Matt Egan, *OPEC tried to put this US shale oil driller out of business.  It 'backfired'*, CNN BUSINESS (May 12, 2017), https://money.cnn.com/2017/05/12/investing/shale-oil-ceo-opec/index.html#:~:text=Saudi%20Arabia%2Dled%20OPEC%20launched,went%20out%20of%20business%2C%20too.

[30]    Mufson, *supra* n.28 (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices.  But its success has been slow, limited and remains fragile.  And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

brought one enormous potential competitor (Russia) into the fold, OPEC turned its attention to Cowboyistan.

59.    Unable to beat Shale Producers in the free market, OPEC started a years-long campaign to add them to the cartel.

60.    Shale Producers, too, were weary of the price war.  As reported by MarketWatch on September 8, 2016, "Shale-oil baron [and Defendant Continental CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[31] Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries [OPEC] to forge a pact that would put an end to slide in crude oil prices."[32]  Hamm and Defendants had gained leverage and the respect of OPEC during the price war.  Now, Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball with OPEC.

61.    Shortly thereafter, in early 2017, Defendants and members of OPEC began meeting and sharing dinners together.[33]  Many of these meetings took place on the sidelines of the CERAWeek Conference, held annually in Houston, Texas.

62.    March 6-10, 2017 – Houston, TX, USA (CERAWeek Conference):    Former Nigerian politician and then-OPEC General Secretary Mohammed Barkindo "dined with about two dozen U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., John Hess of [Defendant] Hess

---

[31]    Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

[32]    *Id*.

[33]    Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10 (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

Corp., Robert Douglas Lawler of [Defendant] Chesapeake Energy Corp. and Tim Leach of Concho Resources Inc."[34]  OPEC had purportedly never before met with U.S. shale producers,[35] leading to reporters describing the meeting as "unusual."[36]  Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries."[37]  Scott Sheffield of Defendant Pioneer stated, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with US [I]ndependents than I have seen over my entire career."[38]

63.    Indeed, CERAWeek 2017 served as a channel for OPEC's Secretary General to "garner views and opinions from other senior oil industry executives" in "bi-lateral" meetings with shale executives, according to Defendant Hess's CEO, John Hess.[39]  Following a dinner with OPEC officials, Hess reported to *Bloomberg*, "***It was a very good exchange of information and views about oil*** . . . I really commend the OPEC Secretary General for outreach.  It was a good talk."[40]  OPEC Secretary General Barkindo confirmed everyone was on the same page regarding

---

[34]    Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[35]    *Id*.

[36]    *Id*.

[37]    *Id*.

[38]    David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says*, BLOOMBERG, (Mar. 7, 2017).  https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts?embedded-checkout=true#xj4y7vzkg.

[39]    CERAWeek 2017: Encouragement & engagement, 47 OPEC BULLETIN 2, (Mar./Apr. 2017), https://docplayer.net/55519391-Vienna-austria-save-the-date-june-hofburg-palace-vienna-austria.html, at 16.

[40]    Javier Blas, *OPEC Said to Break Bread with Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

the need to collectively work to achieve price stability following the meeting, because "no-one wants to see a repeat of 2015 and 2016."[41]

64. During CERAWeek 2017, OPEC and the U.S. Shale Producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead," or at least not yet.[42]  Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih warned U.S. Shale Producers that if they wanted to collaborate, there would be no "free rides" on OPEC production cuts, and they must be ready to pull their weight when the time comes.[43]  Put another way, OPEC told U.S. Shale Producers that OPEC expected Shale Producers to work together and coordinate their production cuts alongside OPEC.

65. Later that year, OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[44]  Barkindo explained that he understood, from a meeting with executives of Defendants Hess and Continental Resources during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[45]

66. March 5, 2018 – Houston, TX, USA (CERAWeek Conference):  In February 2018, discussing plans to meet with U.S. shale executives for the second year in a row at the upcoming

---

[41]     OPEC BULLETIN, *supra* n.39, at 15.

[42]     Blas, *supra* n.40.

[43]     Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, REUTERS (Mar. 9, 2017), https://www.reuters.com/article/us-ceraweek-saudi-shale/exclusive-saudis-tell-u-s-oil-opec-wont-extend-cuts-to-offset-shale-sources-idUSKBN16G2TJ

[44]     Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[45]     *Id.*

March 2018 CERA Week conference, Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek." [46]   Barkindo explained that OPEC and the U.S. shale industry agreed at their first meeting in 2017, that they had a "shared responsibility" towards the oil markets.[47]   The 2018 CERAWeek dinner between OPEC members and U.S. Shale Producers, including Defendants, was organized to "further explore the mechanic of achieving our common objective" of stable production volumes and prices, per Barkindo.[48]

67.    On March 5, 2018, OPEC officials met with U.S. shale executives at Houston's The Grove restaurant, during which Secretary General Barkindo gave a speech to dinner attendees. Afterwards, Defendant Pioneer's then-CEO Tim Dove summarized Barkindo's speech to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth."   Defendant Centennial's CEO, Mark Papa described the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[49]

68.    OPEC representatives, including Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, described the meeting between OPEC and U.S. shale executives as much more than generalizations, with the key takeaway being a shared commitment to exchange confidential production information:  "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and

---

[46]    Blas & Smith, *supra* n.34.

[47]    *Id.*

[48]    *Id.*

[49]    Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energy-opec-shale/rpt-%20ceraweek-u-s-shale-and-opec-share-steak-in-uneasy-truce-at-houston-dinner-idUKL2N1QP05R.

their projections because usually they have good statistics."[50]  Lima explained that, by sharing this information, "[w]hat we are doing is avoiding volatility," or put another way – coordinating production decisions to impact the price of crude oil rather than allowing market forces to dictate outcomes.[51]

69.    Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu agreed that it was time for U.S. shale to "take some responsibilities in terms of stability of oil prices."[52] Indeed, Secretary General Barkindo confirmed that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and we also compared notes from our experiences during these cycles, how we should proceed going forward.  I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[53]  Barkindo explained that OPEC and Defendants "compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious."[54]

---

[50]    *Id*.

[51]    *Id*.

[52]    Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energy-nigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stable-idINKBN1GH347.

[53]    *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB02 2019.pdf, at 51.

[54]    Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

70.    As one shale executive, who insisted on remaining anonymous, described it to *Reuters*, Cowboyistan had parlayed their successful price-war resistance into a seat at OPEC's "***table on pricing***."[55]

71.    In the wake of the 2018 conference, Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers" and, in May 2018, even "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia."[56]

72.    <u>June 2018 – Vienna, Austria (7th OPEC International Seminar):</u>  Following the CERAWeek 2018 dinner, Secretary General Barkindo invited U.S. shale officials to join him at an OPEC summit in Vienna in June 2018.[57]  Defendants' executives Scott Sheffield (Pioneer) and John Hess (Hess) attended the June 2018 OPEC International Seminar in Vienna, Austria.  At the event, Sheffield spoke for all Defendants when he said, "[t]hey [OPEC] need to put together some kind of deal to phase into the market.  None of us want $80 to $100 [per barrel] oil, that's too high.  There's a sweet spot between $60 and $80."[58]  Sheffield urged, "OPEC needs to fulfill its duty."[59]

73.    Critically, the 2018 OPEC summit in Vienna was the first time Defendants admitted publicly to more than listening to OPEC during these meetings.  Sheffield admitted speaking to the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My

---

[55]    Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa/opec-to-meet-with-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

[56]    Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS via YAHOO!NEWS (June 18, 2018), https://www.yahoo.com/news/continental-resources-ceo-harold-hamm-162200046.html.

[57]    Domm, *supra* n.54.

[58]    Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rsc-idINKBN1JG2OB.

[59]    *Id.*

message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference . . . . If they don't we are going to see $100 oil or higher."[60]

74.    Sheffield delivered a message, and apparently got one in return – two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to *Bloomberg* the exact amount of OPEC's forthcoming production change.[61]

75.    <u>January 2019 – Davos, Switzerland (World Economic Forum):</u>  In January 2019 at the Davos World Economic Forum, OPEC's Secretary General sat on a panel with John Hess, CEO of Defendant Hess Corp, Vicki Hollub, CEO of Defendant Occidental, and Dan Yergin, Vice Chairman of IHS Markit.[62]

76.    According to *Reuters*, Hess and Hollub both "said that [the] growth of U.S. shale oil output would slow" in the near future.[63]  OPEC's Secretary General addressed the current oil market dynamics at Davos, highlighting the importance of OPEC+ in helping stabilize the oil market over the past two years following the price war.[64]  He also underscored that market uncertainties and volatility are detrimental to industry investments and that continuing joint and collaborative efforts among producers were crucial to ensure timely investments.[65]

---

[60]    Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D*, Bloomberg (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[61]    *Compare id.* (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million . . . and that will phase in over the next few months.") *with* Rania El Gamal, et al., *OPEC agrees modest hike in oil supply after Saudi and Iran compromise*, Reuters (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply.  Iraq said the real increase would be around 770,000 bpd[.]").

[62]    IHS performs market analyses on behalf of OPEC member nations.

[63]    Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, Reuters (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG.

[64]    *Id.*

[65]    *Id.*

77. These comments were praised by Hess, who said that "the Secretary General of OPEC, as well as OPEC Members, play a very important role in stabilizing markets for oil, so those efforts are to be recognized."[66]  Referencing OPEC's relationships with Defendants, Barkindo emphasized, "[w]e have to continue to collaborate.  It is one industry.  It is a global industry, and I think our colleagues in the US are on the same page with us and we will work together to exchange views."[67]

78. <u>March 11-14, 2019 – Houston, Texas (CERAWeek Conference)</u>:  For the third consecutive year, U.S. shale executives met with OPEC members during CERAWeek.  *Bloomberg* reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[68]  Discussing his upcoming meeting with U.S. shale executives, Secretary General Barkindo shared, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers . . . .  It is essential we continue the conversation with U.S. shale industry."[69]

79. Barkindo reported that a Monday night dinner attended by CEOs John Hess, Vicki Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and Diamondback, respectively,[70] included a "friendly conversation on current industry issues and the

---

[66] Tom DiChristopher, *Trump blasted OPEC this past year.  Hess CEO says the oil producer group deserves praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html.

[67] *Id.*

[68] Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, Bloomberg (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-with-shale-competitors-for-third-year-1.1227226.

[69] *Id.*

[70] *CERAWeek 2019 in Review – New World of Rivalries: Reshaping the Energy Future*, Ceraweek.com (Mar. 2019), https://cdn.ihsmarkit.com/www/pdf/0819/CW19Review.pdf.; Javier Blas & Rachel Adams-Heard, *OPEC Splits Avocado Appetizer with Shale Adversaries in*

immediate prospects and challenges for all."[71]   Diamondback CEO Stice spoke with reporters directly after what he called "a very good session" between OPEC and Defendants, noting that the meeting featured "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[72]



*Defendant John Hess (left) was pictured with OPEC Secretary General Mohammed Barkindo (center)*
*in Houston on March 11, 2019*[73]

80.   In January 2019, OPEC and its allies began new production cuts, agreeing to reduce supply by 1.2 million bpd over the next six months.[74]   After the cuts were announced, *Reuters* reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude

---

*Texas,* BLOOMBERG (Mar. 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year#xj4y7vzkg.

[71]   Blas & Adams-Heard, *supra* n.70.

[72]   *Id.*

[73]   *Id.*

[74]   Alex Lawler, *OPEC posts first 2019 oil-output rise despite Saudi cuts*, REUTERS (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD.

prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[75]  At CERAWeek 2019, Barkindo indicated that OPEC and allies will continue supply adjustments through 2019.[76]

### E.    2021: Defendants Actualize Their Agreement with OPEC

81.    It is unclear when, exactly, Defendants began coordinating their output in conjunction with OPEC.  As 2018 came to an end, it at least appeared to the outside world that OPEC's pleas were falling on deaf ears:

---

[75]    Jennifer Hiller, *U.S. shale producers see OPEC pullback helping 2019 profits*, REUTERS (Dec. 8, 2018), https://www.reuters.com/article/idUSL1N1YC20I/#:~:text=HOUSTON%2C%20 Dec%207%20(Reuters),would%20keep%20their%20profits%20flowing.

[76]    *OPEC Secretary General on Saudi Arabia's oil production, Venezuela and NOPEC*, CNBC (Mar. 12, 2019), https://www.cnbc.com/video/2019/03/12/opec-secretary-general-on-saudi-arabias-oil-production-venezuela.html.

**Figure 2. Change in Crude-Oil Production – U.S. Shale Oil v. OPEC (2014 – 2019)**[77]



Change in crude-oil production since 2014

Source: U.S. Energy Information Administration

82.     Indeed, analysts predicted that 2019 would be the start of "[t]he second wave of the U.S. Shale revolution," which should have been "concerning for OPEC" because "U.S. oil output is expected to grow by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[78]

83.     The second wave never occurred.  In 2020, lockdowns associated with the COVID-19 pandemic cratered gasoline and other crude oil derivative fuel product demand, sending

---

[77]     Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oil-price-supremacy-11555588826.

[78]     *Id*.

multiple shocks through the world oil markets.  Worldwide oil production fell,[79] and the U.S. shale oil industry consolidated and suffered as production fell and smaller Shale Producers went bankrupt.[80]

84.    During this economic turmoil, Defendants and OPEC signaled to each other their willingness to end their price war and market share competition once and for all and collaborate on their respective production levels, and consequently, global crude oil prices. In July 2020, OPEC's Secretary General made it clear that OPEC could inflate and sustain high crude prices if Defendants played ball: "We were able to reach out to the U.S. [I]ndependents and we had established a line of communication with them.  We have reached some level of comfort among ourselves.  They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers.  There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business . . . . Everybody has a role to play . . . .  We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry."[81]  On November 28, 2020, Defendant EOG Resources' CEO Bill Thomas confirmed Defendants' willingness, as a group, to follow OPEC's lead on pricing: "In the future, certainly we believe OPEC will be the swing producer – really, totally in control of oil prices . . . .  We don't

---

[79]    Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html (due to the global Coronavirus pandemic and market panic, OPEC members agreed to "slash[] output [of crude oil] by a record-shattering 9.7 million barrels per day").

[80]    Irina Slav, *Shale Executives See Little Chance of Significant Growth*, OILPRICE.COM via BUSINESS INSIDER (Dec. 6, 2020), https://markets.businessinsider.com/news/stocks/shale-executives-see-little-chance-of-significant-growth-1029867633 ("Between January and October, 43 oil and gas producers in North America filed for bankruptcy protection.  Most of them were from the shale patch.").

[81]    *OPEC Secretary General: No objective to drive US shale out of business*, OIL & GAS JOURNAL (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretary-general-no-objective-to-drive-us-shale-out-of-business.

30

want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[82]

85.     When the world emerged from the pandemic in early 2021, gasoline and other crude oil derivative fuel product demand surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021.  As OPEC and OPEC+ countries rebounded from the pandemic, they collectively withheld production to push up prices further.[83]  As part of these cuts, OPEC signaled to U.S. Shale Producers that OPEC did not view Saudi Arabia, or any other member of OPEC, to be a "swing producer."[84]

86.     Defendants also responded to rising prices by withholding production, suddenly (and in near-unison) preaching supply "discipline" for the first time in the history of U.S. shale.  Over the course of 2021, Defendants would continue to signal to each other, OPEC, and the market that they were no longer competing for market share or willing to act as swing producers:

>     a.     In a February 2021 interview, Defendant Chesapeake CEO Doug Lawler explained that U.S. Shale Producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[85]    Defendant Pioneer CEO Scott Sheffield agreed,

---

[82]     Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.

[83]     Charles Riley, *Oil Prices Surge as OPEC and Its Allies Extend Production Cuts*, CNN BUSINESS (Mar. 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[84]     Amena Bakr and Rafiq Latta, *Saudis Surprise with Big Solo Cut*, INTERNATIONAL OIL DAILY (Jan. 4, 2021) ("Prince Abdulaziz vigorously rejected any suggestion that the [announce production cut] marked a return of Saudi acceptance of a swing producer role.  Those days 'are gone, all over,' he argued.").

[85]     Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 22, 2021), https://www.reuters.com/article/us-shale-opec-outlook/opec-u-s-oil-firms-expect-subdued-shale-rebound-even-as-crude-prices-rise-idUSKBN2AM0E2/.

predicting that small companies would increase output but in the aggregate U.S output would remain flat, even if crude prices go above $60, as the large U.S. Shale Producers would jointly practice discipline.[86]

b.    In March 2021, on the same day that OPEC announced supply restrictions, Defendant Occidental CEO Vicki Hollub said that despite a "healthier supply and demand environment" and "a V-shaped" post-pandemic recovery, U.S. oil production would not return to pre-pandemic heights, because Defendants and other U.S. Shale Producers were "committed to value growth, rather than production growth."[87]

c.    In April 2021, Pioneer CEO Sheffield said that U.S. Shale Producers risked another price war with OPEC and its allies if they resumed the breakneck production growth of the last decade.  He also balked at the federal government's forecasts that predicted an increase in domestic oil production, and instead declared that he was "totally against" any production increase as "producers now know the stakes and will stick to their mantra of capital discipline."[88]

d.    In a June 2021 interview with *Reuters*, Sheffield said that he was "confident the producers will not respond" to the high crude oil prices by increasing

---

[86]    *Id*.

[87]    Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html#:~:text=Occidental%20CEO%20Vicki%20Hollub%20said,Evolve%20conversation%20with%20Brian%20Sullivan.

[88]    Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

production, because they were focused on "shareholder returns."[89]
According to *Reuters*, "[i]n the United States, closely held companies have
contributed substantially to rig additions this year, but Sheffield said those
smaller firms should not drive up volumes enough to ruffle OPEC+
producers."[90]

e.    On an August 5, 2021 earnings call, Defendant EOG President and CEO
Bill Thomas, echoing Lawler's February 2021 language, referenced a "new
era" of collaboration in the global crude oil market with a "more positive
macro environment than we've been in since really the shale business
started.  I think OPEC+ is solid.  I think the U.S. will remain disciplined.
And so, I think the industry is in for a long run of really good results."[91]

f.    On October 3, 2021, Defendant Pioneer CEO Sheffield said U.S. producers
were not willing to increase supply to curb soaring crude oil prices that were
"under OPEC control,"[92] reflecting Defendants' production restraint
agreement.  Sheffield reaffirmed Pioneer's commitment to the agreement,
promising to cap any Pioneer output increase at 5% per year no matter the

---

[89]    Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS
(June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-
even-oil-price-jumps-2021-06-28.

[90]    *Id*.

[91]    EOG Resources (EOG), *Q2 2021 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2021),
https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-
call-transcript/.

[92]    Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise,
Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-
a13a-7d8419426b05.

price of crude oil, explaining that "everybody's going to be disciplined, regardless whether it's $75 Brent,[93] $80 Brent, or $100 Brent . . . ."[94]

87.    Defendants' breakeven prices at the time were around $40/barrel,[95] while Saudi Arabia's 2021 breakeven prices were publicly estimated to be as much as $68/barrel.[96]  Thus, economic conditions were ripe for Defendants to increase production and capture market share. Defendants' restraint, therefore, came as a surprise to some oil industry observers:

       a.     In January 2021, *Reuters* reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[97]

       b.     In June 2021, another *Reuters* columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[98]  2021's "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would

---

[93]    "Brent" refers to Brent crude, a widely recognized benchmark for pricing crude oil internationally.  The price of Brent crude oil is determined through trading on the Intercontinental Exchange ("ICE") in London.  It is often used as a reference point for setting oil prices.

[94]    Brower & Sheppard, *supra* n.92.

[95]    EOG Resources, *Value Matters: 4Q 2021 Presentation*, (2022), https://s24.q4cdn.com/589393778/files/doc_financials/2021/q4/EOG_0222.pdf (Defendant EOG's price needed to secure 10% return on capital, not breakeven, was ~$40); Occidental Petroleum Corp., *Q3 2020 Earnings Call Tr.*, OXY.COM (Nov. 10, 2020), https://www.oxy.com/globalassets/documents/investors/quarterly-earnings/OXY3Q20 Transcript.pdf (Defendant Occidental's breakeven price ~$40); Diamondback Energy, *Investor Presentation* (Nov. 2021), at Slide 11, https://www.diamondbackenergy.com/static-files/532c60b3-f8f0-4f43-8368-91b9f4b628e2 (Defendant Diamondback Energy's 2021 breakeven price was "approximately $32 per barrel.").

[96]    INT'L MONETARY FUND, https://data.imf.org/?sk=388dfa60-1d26-4ade-b505-a05a558d9a42&sid=1479331931186.

[97]    Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (Jan. 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28.

[98]    John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

have triggered a drilling boom."[99]   However, the author observed that Defendants' output restraints had "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices . . . .  Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[100]  The author noted that "there is a broad consensus among OPEC+ countries and the U.S. shale industry on the need for slower output growth, higher prices, and wider profit margins."[101]

      c.      On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas was confounded by Chesapeake's new strategy, telling Chesapeake CEO that their plans to slow production would be "the easiest way to destroy value" for the company in the long term.[102]

88.     OPEC, however, was not surprised.  In early 2021, OPEC estimated that U.S. shale production would see a significant annual drop.  *Reuters* reported that anonymous OPEC sources confirmed that "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[103]  OPEC also signaled that the price war was over.  Secretary General Barkindo told

---

[99]      Hampton, *supra* n.97.

[100]     Kemp, *supra* n.98.

[101]     *Id*.

[102]     Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results - Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022), https://seekingalpha.com/article/ 4489980-chesapeake-energy-corporation-chk-ceo-nick-dellosso-on-q4-2021-results-earnings-call.

[103]     Lawler & Hiller, *supra* n.85.

*Reuters* that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Shale Producers and OPEC "have a shared responsibility in this regard."[104]

### F.    2022-2023:  $200 a barrel?  No Thanks

89.    In 2022, after Russia invaded Ukraine, crude oil prices spiked.  Unlike the steep fall in demand during the early days of COVID-19, this was a supply-side shock that resulted in a decrease in the volume of oil available in the U.S. market, both from increased strain on supply chains and, more importantly, the removal of Russia's oil production from the world market.

90.    By mid-2022, the price of oil crossed $120 a barrel.  At this price, oil cost more than at any point during the five-year runup to the OPEC Price War and nearly quadruple the 2016 price war low water mark.

91.    OPEC responded to the possibility that the high prices might recede with further production restraint, including cuts in October 2022 of "two million barrels per day."  These amounts were announced as crude prices began to normalize from their near-record highs, and were intended to "stabilize the recent fall in global energy prices."[105]

92.    Despite record prices in 2022 and consistently high prices in 2023, in a break from their prior behavior,[106] Defendants refused to increase production in an independently economically rational manner:

---

[104]    *Id.*

[105]    Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/ 2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/.

[106]    *See* Lawler & Scheyder, *supra* n.55 (even OPEC members understood that "[i]t's normal for shale oil, tight oil [production] to increase . . . whenever oil prices support it."); Erik Norland, *As Oil Prices Plunge, What Will Swing Producers Do?*, CME GROUP (Nov. 21, 2018), https://www.cmegroup.com/education/featured-reports/as-oil-prices-plunge-what-will-swing-producers-do.html (in the past, "higher [crude oil] prices incentivize an enormous increase in U.S. production").

a. In February of 2022, as Russian troops staged on the Ukrainian border in advance of the invasion, Sheffield again made comments that support the existence of an agreement between and among Defendants: "In regard to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] [I]ndependents are staying in line," and "I'm confident they will continue to stay in line."[107]  Indeed, following the massive 2022 oil price spike during which oil prices increased 20% between just January and February 2022, Sheffield emphasized, "[w]hether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans[.]"[108]

b. Later in February, other Defendants signaled their alignment.  During an earnings call, Defendant Continental's CEO Berry confirmed, "[w]e project generating flat to 5% annual production growth over the next five years[.]"[109]

c. Defendant Diamondback's executive Stice explained on February 22, 2023, "we have no reason to put growth before returns . . . we will continue to be disciplined."[110]

d. *Bloomberg* reported on February 24, 2022 that Defendant "EOG Resources Inc. plan[ned] to restrain oil growth [in 2022] despite surging prices, falling into line with most other major U.S. independent shale producers. . . . like

---

[107]    Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms%20said%20this%20week.

[108]    *Id.*

[109]    *Id.*

[110]    Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[Defendant] Pioneer Natural Resources and [Defendant] Continental Resources[, who] are also limiting increases to less than 5% this year."[111]

e.  In March 2022, Occidental Petroleum's CEO Vicki Hollub stated that Occidental had a "huge inventory of high-quality investments" available around the world, especially in U.S. shale, but was not acting on those opportunities to expand production, instead focused on maintaining high profits.[112]

f.  On an August 2022 earnings call, Defendant EOG said it planned to keep production growth to "low single digits" in 2023 and it was "committed to remaining disciplined" despite ideal economic conditions for production increases.[113]  In 2022, EOG increased production by only 4% and said it was targeting the same increase in 2023.[114]

g.  In January 2023, Sheffield confirmed that the "aggressive growth era of US shale is over" and that Pioneer and the other Defendants were "no longer a swing producer."[115]

---

[111]    Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[112]    Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

[113]    EOG Resources (EOG), *Q2 2022 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[114]    Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05/.

[115]    Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

  h. When asked in a March 2023 interview why Occidental was not using its profits to "drill more wells" and "bring down prices," Defendant Occidental's President, Vicki Hollub responded that "prices are in a good place right now," "gas prices at the pump are not so bad at this price," and Occidental had no intention of increasing production to meet global demand and lower U.S. consumer gas prices, despite having the ability to profitably increase production.[116]

93. Again, knowing that the Shale Producers' breakeven prices were continuing to fall,[117] oil industry observers expressed disbelief at Defendants' flat out refusal to compete for market share:

---

[116] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[117] *E.g.*, Press Release, *Continental Resources Announces Record 2021 Results; 2022 Projections Highlight Increasing Cash Flow and Corporate Returns, News Release (Exhibit 99.1)*, SEC ARCHIVES (Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/732834/000119312522042827/d272362dex991.htm (Defendant Continental reported that for 2022 it was "projecting an approximately $30 WTI free cash flow breakeven price."); Centennial Resource Development Inc., *2022 Corporate Sustainability Report*, PERMIAN RES.COM (2022), https://permianres.com/wp-content/uploads/2022/08/Centennial-2022-Corporate-Sustainability-Report.pdf. ($32 breakeven for Defendant Centennial); *Using Scenarios to Understand Risks, Opportunities*, CHESAPEAKE ENERGY (2023), https://sustainability.chk.com/climate/portfolio-resilience/ (Defendant Chesapeake breakeven between $33 and $42); *Investor Relations Presentation, May 2022*, HESS CORP. (May 2022), https://investors.hess.com/static-files/3814592c-05ea-4659-9651-88012e29468f (Defendant Hess breakeven ~$45); *The Value Portfolio: Pioneer Natural Resources is Heavily Undervalued*, SEEKING ALPHA (Aug. 9, 2023), https://seekingalpha.com/article/4593056-pioneer-natural-resources-heavily-undervalued (Defendant Pioneer breakeven $39); Irina Slav, *Running Out of Sweet Spots: Shale Growth May Not Materialize*, MARKETS INSIDER (Feb. 7, 2022), https://markets.businessinsider.com/news/stocks/running-out-of-sweet-spots-the-biggest-problem-for-us-shale-1031168908 ("Technologically, oil and gas resources can be stretched to near infinity as drilling technology advances further and further.").

a.    As the *Washington Post* noted, the price increases following the Russian invasion were a "clear signal to raise [shale] production; we're talking Bat-Signal clarity here."[118]

b.    A February 2022 *Bloomberg* article wondered why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields." The article said that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[119]

c.    In March 2022, a *CNBC* anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[120]

d.    Again in March 2023, the *Financial Times* published an article titled, "Oil executives warn of higher prices now that OPEC is back 'in charge.'"[121] Another March 2023 article, this one from *CNBC*, was titled "US won't reach a new oil record in oil production 'ever again' says Pioneer Natural Resources CEO."[122]

---

[118]    Denning, *supra* n.15.

[119]    Crowley, *supra* n.111.

[120]    Stevens, *supra* n.112.

[121]    Myles McCormick, Derek Brower, & Justin Jacobs, *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[122]    Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' Says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

e.  On April 3, 2023, after OPEC made further cuts, *Bloomberg* reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high gas prices, despite being "flush with cash after record profits."[123]  According to one industry expert, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[124]

94.  Defendants' own employees were unable to explain of why production was not ramping up to meet market demand:

a.  A former Senior Lease Operator at Diamondback Energy found it "somewhat weird" that "even with multiple acquisitions and growth, [Diamondback Energy] always maintain[ed] flat production and flat oil sales" during the Class Period.  He was confused by this strategy, asking "[w]e're an oil company, we make money by selling oil… at times when oil was $95 a barrel, why aren't we ripping these things open?"

b.  A former Operations Accountant at Pioneer shared that he observed significant delays, often up to a year, in bringing wells on to produce Shale Oil throughout the Class Period.  This former employee asked his direct supervisor numerous times why these delays were happening and was told that the operations team made those decisions and his supervisor did not have an explanation.  Additionally, this former employee attended Pioneer's quarterly company-wide town hall meetings and said that during these

---

[123]    Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, Bloomberg (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

[124]    *Id.*

meetings, Sheffield would make statements "that did not match the information [he] was seeing" in the drilling data.

95.    Defendants also continued meeting with OPEC officials in 2022 and 2023:

a.    **2022:** Once again, Defendants met with OPEC officials during the 2022 CERAWeek Conference in Houston, Texas on March 6-10, 2022. *Reuters* reported that at the time of this conference, "[i]t was at least the fourth time since 2017 that U.S. shale oil producers and OPEC officials have held such meetings to discuss energy concerns."[125]   In Houston, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy."[126]   As *Reuters* noted, Defendants and OPEC "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[127]   Chesapeake CEO Domenic Dell'Osso confirmed that "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[128]

---

[125]    Liz Hampton & Arathy Somasekhar, *OPEC Meets with U.S. Shale Executives as Oil Prices Skyrocket*, REUTERS (Mar. 7, 2022), https://www.reuters.com/business/opec-meet-with-us-shale-executives-us-energy-conference-oil-prices-skyrocket-2022-03-08/.   (In attendance: EQT Corp Chief Executive Officer Toby Rice, Hess Corp CEO John Hess, and Chesapeake Energy CEO Domenic Dell'Osso).

[126]    Hampton, *supra* n.33.

[127]    *Id.*

[128]    *Id.*

b.    **2023:** In March 2023, the *Financial Times* reported that "about two dozen [U.S. shale executives] including [Defendants' executives:] Sheffield [of Pioneer], . . . Nick Dell'Osso of Chesapeake Energy, Travis Stice of Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais[129] for a private dinner in a downtown Houston steakhouse" to reaffirm their agreement to restrict production, "[d]espite recent record profits."[130]  During this dinner, it was reported that "[t]he shale executives pressed Al Ghais on how much spare production capacity OPEC could deploy, and offered their own assessment of how much extra output the US could deliver this year – a range between 400,000 and 600,000 b/d, according to one person at the dinner."[131]  In the article, Sheffield doubled down on his support of OPEC, "I think the people that are in charge now are three countries – and they'll be in charge the next 25 years. . . .  Saudi first, UAE second, Kuwait third."[132]

96.    Early in 2023, Defendants removed all doubt that they were coordinating with OPEC.

---

[129]    In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his successor.  Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he passed away.  According to the *New York Times*, "[t]here is no indication that the change of leadership will influence how much oil OPEC produces."  Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, THE N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022 /07/06/business/opec-barkindo.html#:~:text=Barkindo%20  was%20scheduled%20to%20leave, how%20much%20oil%20OPEC%20produces.

[130]    Myles McCormick, et al., *Oil Executives Warn of Higher Prices Now that OPEC Is Back in Charge*, FIN. TIMES (Mar. 8, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[131]    *Id.*

[132]    *Id.*

97.    On January 5, 2023, Defendant Pioneer's CEO Sheffield stated that "OPEC ministers are frustrated over the recent price fall," before predicting that forthcoming production was "going to change . . . . If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut . . . . [W]e'll see what happens in the next 90 days."[133]

98.    Eighty-seven days later, OPEC "shocked traders around the world"[134] when it announced a "surprise" production cut, when OPEC "had been largely expected to stick to its already agreed 2m bpd cuts."[135]

99.    After Sheffield's prediction, but before OPEC's surprise production cut announcement, on March 27, 2023, news emerged that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements. This left Defendants "suddenly vulnerable" and exposed them to massive economic risk if oil prices went down.[136]

100.    Indeed, Defendant Pioneer's CEO Sheffield defended the extraordinarily risky move, stating, "we're not going to hedge" and that he was still "optimistic that we'll see $100 a barrel before the end of the year."[137]

101.    Less than a week after news emerged of Defendants' exposed positions, on April 2, 2023, OPEC announced their "surprise" production cut, slashing 1.15 million barrels of oil

---

[133]    Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa#xj4y7vzkg.

[134]    *Id*.

[135]    Reuters, *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN (Apr. 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

[136]    Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

[137]    *Id*.

production per day.[138]  Defendants' failure to hedge was inexplicable but for their advanced

knowledge of OPEC's planned production cuts.

102.    In April 2023, an energy analyst succinctly summarized the effects of Defendants'

output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating
> proportionally as oil prices were dialed up.  That ability to respond quickly to the
> market was due to the speed at which shale wells could be developed: a few months
> compared to the years or decades of Big Oil projects.  Today, shale is as responsive
> as in the past.  But there's a difference.  ***The dimmer appears to be capped at a
> certain level: No matter how high oil prices go above that level – say $100 a barrel
> – the industry will no longer add rigs to sop up market share***.  Rather, it will stay
> put and go into harvest mode with existing wells – that's exactly what happened in
> 2022, much to the consternation of the White House, which urged shale companies
> to drill more.[139]

103.    Shale Producers had the ability to increase production and gain market share, they

just chose not to:

**Table 1:  Defendants' U.S. Oil Production Growth Rates In pre- and post-Class Period**

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| Centennial/Permian[140] | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |

---

138    Reuters, *supra* n.135.

139    Blas, *supra* n.24.

140    On September 1, 2022, Centennial Resources merged with Colgate Energy Partners II,
LLC to form Permian Resources. *Centennial, Colgate Finalize $3.9B Merger; Debut as Permian
Resources Corp*, SHALE EXPERTS (Sept. 1, 2022), https://www.shaleexperts.com/
articles/Centennial-Colgate-Finalize-3.9B-Merger-Debut-as-Permian-Resources-Corp_99995160
3.  Accordingly, the 56% figure listed in Table 1 for Centennial is its 2021-2022 pre-merger growth
rate as public figures do not permit Plaintiffs to back-out production figures from Colgate's rigs
post-acquisition.

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
|---|---|---|
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

104.    Defendants' production restraint agreement worked.  Defendants are reaping the rewards in the form of massive revenue increases while not reinvesting that additional revenue into new production.  *Compare* Figure 3 with Figures 4, 5, 6, 7, 8, 9, and 10 (recording Defendants' revenue growth after 2020).

**Figure 3. U.S. Shale Producer's Reinvestment Rate (capital expenditure as a percentage of operational cash flow)**



**Figure 4. Pioneer's Annual Revenue (USD)**



**Figure 5. Permian/Centennial's Annual Revenue (USD)**



**Figure 6. Chesapeake's Annual Revenue (USD)**



**Figure 7. Continental's Annual Revenue (USD)**



**Figure 8. Diamondback's Annual Revenue (USD)**



**Figure 9. EOG's Annual Revenue (USD)**



**Figure 10. Occidental's Annual Revenue (USD)**



**G.    Defendants' "Restraint" Is Economically Irrational, Absent Agreement**

105.    The terms Defendants used may have varied: being "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns."  But they are all code words for each Defendant's agreement to coordinate and restrain domestic shale oil production. Further, Defendants' repeated public confirmation of their production discipline was an admission that they each had spare productive capacity that they chose not to utilize.

106.    In a competitive market for arguably the most important commodity on earth: crude oil, expanding production to take advantage of prices above a company's breakeven is the economically rational response.  If a company does not do that, its competitor will; taking margin share and reinvesting its additional profits into further production capacity and/or efficiency gains. Defendants taught OPEC this lesson during the Shale Revolution.

107.    In a competitive market, no single Defendant would restrain production unless they **knew** their competitors would also restrain their production.  No business in a competitive market would turn down opportunities to make three times marginal cost (*i.e.*, breakeven) and couch that economically irrational decision with a preposterous statement about focusing on "shareholder returns."  In a competitive market, if a company is not drilling that oil, someone else is.

108.    And others did drill some of that oil.  Notoriously conservative and well-known to view fracking as a waste of time (in part because their overhead structure made small-scale operations relatively more expensive), the supermajors started investing in shale in 2021 and 2022 at rates previously unseen, in direct response to U.S. Shale Producers "underinvesting as an industry":[141]

---

[141]    Clifford Krauss, *What Exxon & Chevron are Doing with Those Big Profits*, THE N.Y. TIMES (Feb. 1, 2023), https://www.nytimes.com/2023/02/01/business/energy-environment/exxon-chevron-oil-gas-profit.html.

a. ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25% in response to record high crude oil prices.[142]

b. Similarly, Chevron planned a 10% increase in the same region in 2022 "from an even larger production base."[143]

c. Midway through 2022, Chevron anticipated a "15% year-over-year increase" in shale oil production from 2021 and promised to continue "bolstering production."[144]

d. In May 2023, ExxonMobil Chief Executive Darren Woods said that Exxon is hoping to double the amount of oil produced from its U.S. shale holdings over a five-year period using new technologies.[145]

109.    Smaller, non-public shale companies drilled some of that oil, too.  In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead."[146]  Due to the gap in production left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[147]  For example,

---

[142]    Kevin Crowley, et al., *Exxon and Chevron Plan Permian Oil Surge as Peers Preach Caution*, BLOOMBERG (Feb. 2, 2022), https://www.bloomberg.com/news/articles/2022-02-01/exxon-joins-chevron-in-permian-oil-surge-as-peers-preach-caution.

[143]    *Id.*

[144]    *Chevron to Boost Permian Oil Production as Demand for Reliable Energy Grows*, CHEVRON (June 16, 2022), https://www.chevron.com/newsroom/2022/q2/chevron-to-boost-permian-oil-production-as-demand-for-reliable-energy-grows.

[145]    Sabrina Valle, *Exxon CEO Says Technology Advances Could Double Its Shale Output*, REUTERS (June 1, 2023), https://www.reuters.com/business/energy/exxon-ceo-says-5-year-program-could-double-its-shale-output-2023-06-01/.

[146]    Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, REUTERS (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/.

[147]    *Id.*

*Reuters* reported that, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[148]

110.    But small shale oil producers going from one rig to two is not enough to meaningfully move U.S. production when Defendants control 18% of the total active oil rigs in the U.S., including conventional oil rigs and rigs owned by supermajors.[149]    With those rigs, in 2023 Defendants were responsible for approximately 16.2% of U.S. total crude oil production (including conventional crude oil).    Defendants are able to leverage their collective market share because of how fragmented the domestic oil market is: of the 247 companies operating oil rigs in the U.S., 162 companies are running just one rig.[150]    Only 10 companies own 15 or more rigs – five are Defendants (EOG, Occidental, Pioneer, Diamondback, and Continental), and three of the other five are supermajors (Exxon, Chevron, and ConcoPhillips).[151]

111.    Defendants' market power is enhanced by the fact that conventional oil production in the U.S. is largely fixed and companies cannot quickly add or remove production volume in response to price changes.

112.    OPEC believes itself to be outside the reach of the Sherman Act, so OPEC does not use code words when describing its coordination with, and the coordination among, Defendants. In OPEC officials' own words, OPEC and Defendants "collaborate,"[152] "compare[] notes[s],"[153] "work together to exchange views,"[154] discuss "how [OPEC and Defendants] should proceed going forward,"[155] "further explore the mechanic of achieving [OPECs and Defendants'] common

---

[148]    *Id*.

[149]    Data obtained from https://oilgasleads.com/top-drilling-company/ on December 11, 2023. Figures reflect a snapshot of rigs operating at December 2023.

[150]    *Id*.

[151]    *See supra* n.149.

[152]    DiChristopher, *supra* n.66.

[153]    *OPEC bulletin Special Edition*, supra n.49, at 51(OPEC Secretary General Barkindo).

[154]    DiChristopher, *supra* n.66.

[155]    *OPEC bulletin Special Edition*, *supra* n.53, at 51 (OPEC Secretary General Barkindo).

objective,"[156] and discuss OPECs and Defendants' "shared responsibility"[157] for global oil markets.

113.    Whether expressed in code words or direct terms, Defendants' agreement by and between themselves and OPEC to coordinate U.S. domestic shale oil production is *per se* illegal under the Sherman Act.

## V.    POST-FILING REGULATORY ACTIVITY

114.    The first class action complaint against Defendants related to the conduct described herein, *Rosenbaum v. Permian Resources Corp, et al.*, No. 2:24-cv-00103-MMD-MDC (D. Nev.) was filed on January 12, 2024.  Between the filing of *Rosenbaum* and the filing of this Complaint, regulators have uncovered evidence supporting the allegations described above and first advanced in *Rosenbaum*.

### A.  Exxon-Pioneer Merger

115.    On May 2, 2024, the Federal Trade Commission ("FTC") announced they had reached a consent decree with Exxon in connection with Exxon's then-pending acquisition of Defendant Pioneer (the merger, the "Exxon-Pioneer Merger").[158]

116.    This decree forbids Pioneer's former-CEO, Defendant Scott Sheffield, from joining Exxon's Board of Directors based on FTC's evidence of Sheffield's years-long efforts to fix the price of crude oil.[159]

---

[156]    Blas & Smith, *supra* n.34 (OPEC Secretary General Barkindo).

[157]    Sam Meredith, *OPEC Calls on US Shale Oil Producers to Accept 'Shared Responsibility' of Slashing Global Supply,* CNBC (Oct. 10, 2017), https://www.cnbc.com/2017/10/10/opec-calls-on-us-shale-oil-producers-to-accept-shared-responsibility.html    (OPEC    Secretary    General Barkindo).

[158]    *See* Press Release, *FTC Order Bans Former Pioneer CEO from Exxon Board Seat in Exxon-Pioneer Deal*, U.S. FED. TRADE COMM'N (May 2, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/05/ftc-order-bans-former-pioneer-ceo-exxon-board-seat-exxon-pioneer-deal.

[159]    Consent Order, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (May 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2410004exxonpioneerorderredacted.pdf.

117.    The decree follows from an FTC administrative complaint (the "FTC Exxon Complaint"), which was released in redacted form on May 2, 2024.[160]  The FTC Exxon Complaint states:

> Through public statements and private communications, Pioneer founder and former CEO Scott D. Sheffield has campaigned to organize anticompetitive coordinated output reductions between and among U.S. crude oil producers, and others, including the Organization of Petroleum Exporting Countries ("OPEC"), and a related cartel of other oil-producing countries known as OPEC+. Mr. Sheffield's communications were designed to pad Pioneer's bottom line – as well as those of oil companies in OPEC and OPEC+ member states – at the expense of U.S. households and businesses. . . . [as] [i]ncreases in crude oil prices are passed on to Americans through higher gasoline, diesel, heating oil, and jet fuel prices.

FTC Exxon Complaint, ¶¶1-2.

118.    The FTC Exxon Complaint references documents, including Mr. Sheffield's WhatsApp and text messages, that Defendant Pioneer produced to the FTC as part of the FTC's review of the Exxon-Pioneer Merger. *See id.*, ¶¶5-6.

119.    Specifically, the FTC alleged that documents produced by Pioneer as part of the FTC's Exxon-Pioneer Merger investigation revealed:

    a.  In 2020, Sheffield's "close communications with high-ranking OPEC officials [] during the early days of the COVID pandemic [] focused on [] Sheffield's efforts to limit Permian oil production in the face of falling oil prices globally." *Id.*, ¶38;

    b.  Even after the economy and oil prices recovered from the COVID pandemic, "Sheffield did, in fact, stay in regular contact" with OPEC officials, *id.*, ¶¶39-40, and has "exchanged information on oil pricing and output with OPEC representatives." *Id.*, ¶41;

---

[160]    FTC Administrative Complaint, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (May 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2410004exxonpioneercomplaintredacted.pdf.

     c.   Over the past few years, Sheffield has, through "text messages," "in-person meetings," and other means of communication, "discuss[ed] crude oil market dynamics, pricing, and output" with Pioneer's U.S. competitors. *Id.*, ¶¶6, 36;

     d.   Sheffield served as a "conduit" between U.S. Shale Producers and OPEC, *id.*, ¶41; and "also worked to facilitate communications between his competitors in the Permian Basin and OPEC." *Id.*, ¶¶41-42; and

     e.   Sheffield, through "WhatsApp" messages and other means of communication, "held repeated private conversations with high-ranking OPEC representatives assuring them that Pioneer has its Permian Basin rivals were working hard to keep oil output artificially low," *id.*, ¶5, "and to discuss U.S. producers' efforts to maintain capital discipline in order to increase Pioneer's profits." *Id.*, ¶34.

120.   Among other facts, Sheffield recently admitted that he exchanged WhatsApp messages with a government minister and acknowledged that those messages were referenced in the FTC complaint. *See* Comment on Behalf of Scott Sheffield, *In the Matter of Exxon Mobil Corp.*, File No. 241-0004 (F.T.C. May 28, 2024), at 21 (claiming that the messages referred to in the FTC Complaint "were entirely innocuous.").

121.   Contemporaneous public reporting suggests that Pioneer submitted "millions of documents" to the FTC – hundreds of which were communications between Sheffield, Pioneer's competitors, and/or OPEC – as part of the agency's second-level review into the Exxon-Pioneer Merger's possible anticompetitive effects.[161]

122.   FTC Chair Lina Khan summarized the Exxon-Pioneer Merger investigation findings:

---

[161]    Benoit Morenne, et al., *Former Pioneer CEO Is Accused of Trying to Collude with OPEC*, THE WALL STREET J. (May 2, 2024), https://www.wsj.com/business/energy-oil/ftc-says-ex-pioneer-ceo-tried-to-collude-with-opec-on-oil-prices-27edf5bd.

> A core principle that should underpin the Commission's antitrust analysis is examining and understanding commercial realities. Sometimes the evidence that is most probative of commercial realities is how market participants act. Staff's investigation here uncovered troubling evidence of Pioneer CEO Scott Sheffield's actions and communications, which make clear that he believed and acted as if he could persuade his rivals to join him in colluding to restrict output and raise prices. ***When market actors speak and act as if they can collude, we should not ignore this direct evidence***[.][162]

**B. Chevron-Hess Merger**

123. On September 30, 2024, the FTC announced that it had reached a consent decree with Chevron in connection with Chevron's pending acquisition of Defendant Hess (the merger, the "Chevron-Hess Merger").[163]

124. This decree forbids Hess CEO, Defendant John Hess, from joining Chevron's Board of Directors based on FTC's evidence of Hess's years-long efforts to fix the price of crude oil.[164]

125. The decree follows from an FTC administrative complaint (the "FTC Chevron Complaint") that was released in redacted form on September 30, 2024.[165] The FTC Chevron Complaint states, in part:

> Hess Chief Executive Officer ("CEO") John B. Hess ("Mr. Hess") has communicated publicly and privately with OPEC representatives and oil ministers of OPEC member states about global output and other dimensions of crude oil market competition.

---

[162] *Public Statement of Chair Lina M. Khan in the Matter of Exxon Mobil Corporation*, U.S. FED. TRADE COMM'N (May 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2410004 exxonpioneerlmkstmt1_0.pdf (emphasis added).

[163] *See* Press Release, *FTC Order Bans Hess CEO from Chevron Board in Chevron-Hess Deal*, U.S. FED. TRADE COMM'N (Sept. 30, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-order-bans-hess-ceo-chevron-board-chevron-hess-deal.

[164] Decision and Order, *In the Matter of Chevron Corp.*, File No. 241-0008 (Sept. 30, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/Chevron-Hess-DecisionandOrder.pdf.

[165] FTC Administrative Complaint, *In the Matter of Chevron Corp.*, File No. 241-0008 (Sept. 30, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/Chevron-Hess-Complaint.pdf.

> Mr. Hess encouraged high-level OPEC representatives in their stated mission to stabilize global oil markets.

FTC Chevron Complaint, ¶¶4-5.

126. The FTC Chevron Complaint further alleges that "Hess's ordinary course documents demonstrate that, as Hess's CEO and Director, Mr. Hess had access to and connections with OPEC Oil Producers, his market rivals" and that "Mr. Hess attended public meetings and maintained private communications with OPEC representatives during [his CEO tenure]." *See id.*, ¶26.

127. Specifically, the FTC alleged that documents produced by Hess as part of the FTC's Chevron-Hess Merger investigation revealed:

a. A lengthy history of communications and meetings between John Hess and OPEC Secretary General Barkindo, including several of the communications and meetings described above. *Id.*, ¶¶27-40;

b. Years-long communications and meetings between John Hess and subsequent OPEC Secretary General Al Ghais. *Id.*, ¶¶41-43;

c. Extensive private communications with Saudi Arabian oil executives at Saudi Aramco, the national oil company of Saudi Arabia and fourth-largest company in the world by revenue. *Id.*, ¶¶44-47;

d. John Hess's public statements regarding the interplay between Shale Producer and OPEC production levels, and the impact of those production levels on world crude oil prices, featured "repeated themes from his private conversations about market stability and other business topics that he had with Mssrs. Barkindo, Al Ghais, and [the Saudi Aramco executives]." *Id.*, ¶48; and

e. John Hess's statements to investors about OPEC's role in influencing global crude oil prices while acting as CEO were "consistent with his private communications with OPEC representatives." *Id.*, ¶49.

128.    Importantly, FTC Chair Lina Khan explicitly linked the FTC's actions related to the Exxon-Pioneer Merger and the Chevron-Hess Merger – further reinforcing the allegations above that **both** Pioneer and Hess were coordinating with OPEC ***at the same time and in a similar manner***:

> The Commission's actions in *Chevron-Hess* and *Exxon-Pioneer* mark an important step towards ensuring that U.S. oil producers are serving as a competitive check on OPEC+ rather than subordinating their independent decision-making to the goals set by a cartel. . . . Rivals responding to one another by increasing production, rather than coordinating to hold it back, represents the type of competitive dynamic the antitrust laws were designed to protect.[166]

## VI.    PLUS FACTORS

129.    The presence of a number of factors, referred to as "plus factors" and "super plus factors" render the U.S. shale oil industry highly conducive to collusion.  Plus factors are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[167]  "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."[168]  The following plus and super plus factors alleged herein support an inference that Defendants' actions constituted a per se unlawful price-fixing conspiracy, not merely parallel conduct:

---

[166]    *Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro Bedoya in the Matter of Chevron Corporation and Hess Corporation*, U.S. FED. TRADE COMM'N (Sept. 30, 2024), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-joined-commissioner-rebecca-kelly-slaughter-commissioner-alvaro-bedoya-1.

[167]    William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[168]    *See id.* at 426.

a.    The market conditions for U.S. shale oil are favorable to collusion.  As discussed above, the U.S. shale oil industry is highly fragmented at the bottom but consolidated at the top, with a small number of much larger producers and hundreds of smaller producers.  In this top-heavy market, these larger producers (Defendants) always "knew which oil company was buying what from who," according to a former Portfolio Analyst at Occidental.

b.    Defendants have excess capacity.  As discussed more fully above, during the Class Period, Defendants openly admitted that they were not operating at full drilling capacity and affirmatively argued that operating at less than full capacity was a strategy decision to increase profits;

c.    Defendants are also involved in multiple industry trade associations and regularly attend trade meetings, giving them ample time and opportunity to coordinate supply restraints and curtail cheating on the conspiracy.  As detailed above, Defendants did in fact meet during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that excess capacity.

d.    There is a high level of interfirm communication and coordination between Defendants, beyond what is described above:

i.    A fracking consultant that worked for both EOG Resources and Centennial Resource Development during the Class Period explained that most major operators in the Midland Basin "all work together to share resources" even though "it may seem like they are competitors."  The former consultant witnessed instances where

Centennial would ask EOG Resources to modify their fracking schedule to accommodate Centennial's production plans. He said that "gentleman's agreements" are prevalent in the U.S. shale industry.

ii. A former engineer at Hess during the Class Period disclosed that Hess executives routinely had round-table discussions with other operators in the Bakken Basin, a major shale play in North Dakota, to discuss best practices for operations, equipment designs, and safety protocol.

iii. A former senior construction manager at Hess during the Class Period confirmed that Hess "collaborated all the time with other production companies" and he personally attended a regular in-person roundtable with "all top tier producers," including EOG Resources and Continental Resources, to discuss extraction processes, measuring wells, and other construction and operation methods.

iv. A former Senior Lease Operator at Diamondback Energy said that Diamondback Energy often collaborated with other Shale Oil producers, like Pioneer, to share water supplies.

e. The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly

inelastic demand.[169]  Academic studies have demonstrated that when oil prices rise, U.S. consumer spending on gasoline and other crude oil derivative fuel products remains relatively flat, while consumer spending on non-crude derivative consumable goods falls – reinforcing the conclusion that the demand for gasoline and crude oil derivative fuel products is highly inelastic.[170]

f.    Defendants' actions were against Defendants' independent self-interests but for the existence of an agreement.  As detailed above, Defendants repeatedly met with each other and OPEC representatives and discussed between and among themselves and with OPEC representatives their confidential business plans, including forward-looking production and capacity information.  No rational business would share this proprietary and competitively sensitive information with a direct competitor, absent collusion.  Following these mutual exchanges, Defendants would decide not to increase their respective production volumes, even though an increase would have been in their individual rational economic best interests, given rising prices.  Instead, Defendants withheld production in a manner that would only be in their individual rational economic best interests if Defendants had an agreement between themselves and OPEC to coordinate production levels to maintain crude oil prices at artificially high

---

[169]    Gasoline itself has highly inelastic demand, meaning that very few consumers will switch to alternative products as the price at the pump rises.  This reinforces the inelasticity of upstream demand for crude oil.

[170]    James D. Hamilton, "Causes and Consequences of the Oil Shock of 2007-08," *Brookings Papers on Economic Activity* (Spring 2009), https://www.brookings.edu/wp-content/uploads/2009/03/2009a_bpea_hamilton.pdf.

levels. Defendants repeatedly communicated forward-looking production data and publicly commented on each other's production announcements in a manner that would be irrational, absent an agreement.

## VII.    ANTITRUST INJURY

### A. Organization of the U.S. Petroleum and Gasoline Industry

130.    The U.S. Oil and Gas industry is generally divided into three major segments: upstream, midstream, and downstream. The upstream segment contains crude oil production and exploration; the midstream segment includes activities related to transporting crude oil to refineries; and the downstream sector includes refining and distribution.

131.    The upstream production and exploration segment can be further divided into onshore and offshore, with offshore being further divided into shallow water and deep water. Onshore can be divided into the type or reservoir in which the oil is held, conventional, low-permeability, and shale.[171] As of year-end 2022, over 55% of the 48,321 million barrels of proven reserves in the U.S. were in onshore shale deposits.[172]

132.    After crude oil is extracted, it is transported via a network of road, rail, ship, and pipeline networks that make up the midstream segment. To get an idea of the magnitude of such transportation networks, the Pipeline and Hazardous Materials Safety Administration, PHMSA Pipeline Safety, 2023[173] reports that of the 229,888 miles of pipeline in the U.S. related to the oil

---

[171]    *See, e.g.*, *Exploration & Production*, AM. PETROLEUM INST., https://www.api.org/oil-and-natural-gas/wells-to-consumer/exploration-and-production (last accessed Nov. 3, 2024). *See also U.S. Crude Oil and Natural Gas Proved Reserves, Year-end 2022*, U.S. ENERGY INFO. ADMIN. (Apr. 29, 2024), https://www.eia.gov/naturalgas/crudeoilreserves/.

[172]    *See U.S. proved reserves and reserves changes, 2021-22*, U.S. ENERGY INFO. ADMIN. (Apr. 29, 2024), https://www.eia.gov/naturalgas/crudeoilreserves/pdf/Table_1.pdf; and *Crude Oil and lease condensate production and proved reserves, from shale plays, 2021-22*, U.S. ENERGY INFO. ADMIN. (Apr. 29, 2024), https://www.eia.gov/naturalgas/crudeoilreserves/pdf/Table_2.pdf.

[173]    *Where are Liquid Pipelines Located?*, PIPELINE101 (Mar. 2023), https://pipeline101.org/topic/where-are-liquid-pipelines-located/.

and gas industry, 84,712 miles are related to midstream crude oil distribution (almost 40%). Of the remainder, 64,218 miles are for the marketing of petroleum products and 80,959 are for natural gas liquids and $CO_2$/ethanol distribution.

133.    The downstream segment involves refining and transporting the resultant crude oil fuel derivatives to market.[174]  Figure 11 below shows that crude oil is used to produce gasoline, fuel oil, gas liquids, jet fuel, and other products.  Most of those are consumed in the transportation sector, although others are consumed by industrial users and in the residential, commercial, and energy sectors.

**Figure 11: U.S. Petroleum Products Consumption by Source and Sector (2022)**[175]

---

[174]    *See, e.g.*, *Interim Report on Gasoline Pricing: A Report to Congress*, FED. TRADE COMM'N, at 1-2 (Mar. 2006),https://www.ftc.gov/sites/default/files/documents/reports/interim-report-gasoline-pricing-report-congress/0510243gasolinepricesinvestigationinterimreporttocongress.pdf ("Congress directed the Federal Trade Commission to conduct an investigation to examine gasoline pricing [via] Section 1809 of the Energy Policy Act of 20051 (the 'Energy Policy Act') . . . . The examination mandated by the Energy Policy Act requires a thorough analysis of the petroleum industry supply infrastructure from the refinery to the street level", including "refining, product transportation by pipeline and marine vessel, terminaling, marketing, and retail.").

[175]    U.S. ENERGY INFO. ADMIN, https://www.eia.gov/energyexplained/oil-and-petroleum-products/images/petroleum_spaghetti_2022.pdf.



**U.S. petroleum products consumption by source and sector, 2022**

million barrels per day (b/d)

Sources: U.S. Energy Information Administration (EIA), *Monthly Energy Review* (April 2023), Tables 3.5, 3.7a, 3.7b, and 3.7c.
Note: Data include biofuels mixed with petroleum products. Sum of components may not equal total due to independent rounding. See "Extended Chart Notes" on next page.
ᵃ Includes asphalt and road oil, aviation gasoline blending components,

lubricants, kerosene, petrochemical feedstocks, petroleum coke, residual fuel oil, still gas (refinery gas), special naphthas, waxes, unfinished oils, and miscellaneous products. Also includes biofuels (excluding fuel ethanol) products supplied.
ᵇ Industrial, commercial, and electric power sectors include primary energy consumption by combined-heat-and-power (CHP) and electricity-only plants in the sector.

134.    Another 64,218 miles of pipeline (nearly 30%) is devoted to transporting petroleum products to terminals that market products to end users in local market areas.[176] "Marketing is the wholesale and retail distribution of refined petroleum products to business, industry, government, and public consumers."[177]  Because not all terminals lie along pipelines, rail and truck transport augments the pipeline network.

---

[176]    PIPELINE101, *supra* n.173.

[177]    *Oil and Gas Industry: A Research Guide – Downstream: Refining and Marketing*, LIBRARY OF CONGRESS, https://guides.loc.gov/oil-and-gas-industry/downstream#s-lib-ctab-21990168-1 (last accessed Nov. 3, 2024).

135.    Gasoline sales from the terminal are made through retail or wholesale channels. Retail sales are defined by the U.S. Energy Information Administration ("EIA") as those through "[a]ny company-owned outlet (*e.g.*, service station) selling gasoline" or other petroleum products.[178]

136.    Gasoline sales from refineries are made through three key channels: dealer tank wagon, rack, and bulk sales.  Dealer tank wagon sales are "[w]holesale sales of gasoline priced on a delivered basis to a retail outlet," such as sales to an independent retail outlet or service station.[179] Rack sales are "[w]holesale truckload sales or smaller of gasoline where title transfers at a terminal."[180]  Bulk sales are "[w]holesale sales of gasoline in individual transactions which exceed the size of a truckload."[181]

137.    In all such cases, 26 C.F.R. §48.4081-3 stipulates that "tax is imposed when taxable fuel is removed from the terminal at the [physical] rack," so that taxes are not included in the rack price.[182]  (Note that here, the reference to the "rack" is to the physical equipment that dispenses gasoline into the delivery vehicle.)[183]  Therefore, the three types of wholesale transactions differ primarily by whose truck is used and how big the shipment is.  Dealer tank wagon sales prices are

---

[178]    *Petroleum & Other Liquids: Definitions, Sources and Explanatory Notes*, U.S. ENERGY INFO. ADMIN., https://www.eia.gov/dnav/pet/TblDefs/pet_cons_refmg_tbldef2.asp.

[179]    *Id*.

[180]    *Id*.  While title transfers at the terminal, "[s]ome . . . customers own their own trucks to transport the fuel or they may hire common carriers to do it for them."  *Pricing 101: Wholesale Rack Fuel Pricing Essentials*, DOW JONES OPIS (Mar. 16, 2023), https://www.opisnet.com/blog/wholesale-rack-fuel-pricing-essentials/.  Regardless, transportation charges are not included in the rack price.

[181]    U.S. ENERGY INFO. ADMIN., *supra* n.178.

[182]    LEGAL INFORMATION INSTITUTE (CORNELL LAW SCHOOL), https://www.law.cornell.edu/cfr/text/26/48.4081-3.

[183]    *See, e.g.*, DOW JONES OPIS, *supra* n.180 ("A rack is a fuel distribution point – usually along a pipeline – where fuel is supplied and stored.  We call it a 'rack,' because trucks pull up to an actual loading rack to receive fuel from their fuel suppliers.").

typically higher than straight rack sales because delivery charges are included, while bulk sale prices are slightly lower due to bulk discounts.[184]

138.    End-payors purchase the majority of their gasoline from gas stations and hypermarkets (warehouse-type grocery stores that often have their own filling stations, like Costco and Sam's Club), although a small percentage of end-payors purchase their gasoline directly from the rack at a mechanical discount.  The distribution of gasoline is represented in the below Figure 12:

---

[184]     *See, e.g.*, *Petroleum & Other Liquids: Refiner Gasoline Prices by Grade and Sales Type*, U.S. ENERGY INFO. ADMIN. (June 1, 2022), https://www.eia.gov/dnav/pet/PET_PRI_REFMG_D CU_NUS_M.htm.

**Figure 12. Gasoline Distribution Chain**[185]



139.    Rack prices are also the focus of a great deal of research because they provide a valid and meaningful benchmark price for all purchasers in a geographic region, taking into account regional prices.  This is important because not all racks lie on pipelines, so that some rack

prices include additional common transportation costs to the relevant geographic market. Rack prices do not, however, include additional transportation costs to retail or end-user outlets.

140. There are standardized "rack reports" for each geographic area, and rack prices change once daily, at 6:00 pm.[186] Dow Jones' OPIS tracks daily rack pricing for 460 racks in the U.S.[187]

141. Because rack prices set the benchmark for retail, dealer tank wagon, and bulk sales, prices for each of these types of sales are highly correlated. *See also* Figure 13 below. Both rack and bulk prices do not contain transportation charges, taxes, or fees, so those are correlated nearly perfectly, at 0.997.[188] Even including transportation costs, rack and bulk prices are highly

---

[185]    As context to Figure 12, *see* (1) Expert Declaration of Dr. Joseph R. Mason, contained at pages 46-56 of the Declaration of Patrick J. Coughlin in Support of First Filed Group's Application to Appoint First Filed Group's Leadership Structure, ECF No. 58-1 in *In re Shale Oil Antitrust Litig.*, No. 1:24-cv-03119-MLG-LF ("Mason Declaration"), ¶14: "Wholesale gasoline sales are made through three key channels: dealer tank wagon, rack, and bulk sales."; (2) Mason Declaration, ¶¶15-16: "Because rack prices set the benchmark for retail, DTW, and bulk sales, prices for each of these sales types are highly correlated. Neither rack or bulk prices contain transportation charges, taxes, or fees, so those are correlated nearly perfectly, at 0.997. Even including transportation costs, those are highly correlated with rack prices, at 0.951 and 0.934, respectively. Retail and DTW prices are also highly correlated, at 0.978"; (3) Declaration of Bruce F. Burke, ECF No. 56-1 in *In re Shale Oil Antitrust Litig.*, No. 1:24-cv-03119-MLG-LF ("Burke Declaration"), ¶¶18, 19, and 24 (Relevant portion: "'Wholesale' purchasers are typically businesses or entities – such as municipalities or trucking companies – with substantial assets and fuel requirements. Assets could include a fleet of vehicles, a dedicated staff, buildings and other associated infrastructure, which in combination require supply of much larger amounts of light petroleum products than individual retail purchasers."); (4) Burke Declaration, ¶20: "By contrast, 'retail' purchasers are typically individual vehicle owners who purchase gasoline by the tankful at a service station or truck stop."

[186]    Dow Jones OPIS provides a sample report at https://www.opisnet.com/wp-content/uploads/2019/01/rack-report-sample.pdf.

[187]    *OPIS Rack City List*, Dow Jones OPIS, https://www.opisnet.com/about/rack-pricing-coverage-city/#GasolineDiesel (last accessed Nov. 3, 2024). While there are an estimated 400 racks in operation in the U.S., Dow Jones also includes historical prices for legacy racks no longer in operation.

[188]    *See, e.g.*, Dow Jones OPIS, *supra* n.180 ("The only charges included in a rack price are the charges that are incurred transporting the fuel from the refinery to the distribution rack.").

correlated with retail prices, at 0.951 and 0.934, respectively. Retail and DTW prices are also highly correlated, at 0.978.

**Figure 13. Gasoline Prices, by Source**



**Gasoline Prices, by Source**

**B. Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Crude Oil Throughout the Class Period**

142.    Historically, global crude oil demand was primarily met by oil obtained from conventional drilling. Following the Shale Revolution, the influence of U.S. shale production on crude oil prices (and crude oil derivative fuel product prices) is undeniable, a fact recognized by market analysts and economists alike:

    a.    A *Forbes* article from 2019 claims that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because,

since 2008, "U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."[189]

    b.    In a 2017 article titled "The oil market in the age of shale oil," economists concluded that, since 2014, U.S. shale oil has affected oil prices by increasing global crude oil supply and influencing OPEC policies.[190]

    c.    In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors declared that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.[191]

    d.    In 2020, economists from the Federal Reserve Bank of Dallas found that without the shale oil revolution, oil prices would have risen by 36% in 2018.[192]

    e.    In 2023, an article in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."[193]

---

[189]     Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=249e989b5125.

[190]     Irma Alonso Alvarez 7 Virginia Di Nino, *The oil market in the age of shale oil*, 8 ECB ECON. BULLETIN, 57-74 (2017).

[191]     *The Value of U.S. Energy Innovation & Policies Supporting the Shale Revolution*, COUNCIL OF ECON. ADVISORS (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[192]     Nathan S. Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, FED. RESERVE BANK OF DALLAS (June 17, 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[193]     Rodhan, *supra* n.25, at 433-43.

143.    As noted above, U.S. Shale Producers' output decisions have a disproportionate impact on the price of crude oil because they are swing producers for the global market.[194]  When competing with each other (and OPEC), as the largest Shale Producers in a very fractured production landscape, Defendants have sufficient market power to dictate whether the U.S. can produce enough shale oil in response to high crude prices to "swing" the market and push prices down.  Indeed, scholars have estimated that "U.S. supply shocks" (*i.e.*, the Shale Revolution) accounted for up to 13% of the global oil price variation from 2003-2015.[195]

144.    Defendants acknowledge that they have power and are choosing not to use it.  For example, on March 2, 2022, the *New York Times* reported that "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices . . . ."[196]

145.    Since at least 2021, Defendants have collectively coordinated their production decisions, leading to production growth rates that are lower than would be seen in a competitive market, despite high oil prices and healthy global demand.

146.    Despite production increases from supermajors and smaller private producers, Defendants' production restraint has had a considerable impact on total U.S. shale production.  In 2022, U.S. shale oil production increased by only 500,000 barrels, which was 50% short of market analysts' general yearly estimates.[197]

---

[194]    Lee, *supra* n.21.

[195]    Thomas S. Gunderson, *The Impact of U.S. Supply Shocks on the Global Oil Price*, The Energy J. 41:1 (Jan. 1, 2020).

[196]    Stanley Reed, *As Oil Soars, OPEC and Its Allies Decline to Offer Relief*, The N.Y. Times (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[197]    Eric Rosenbaum, *Oil CEOs are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax*, CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

C.    **Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Gasoline and Diesel Fuel Purchased by Plaintiffs and the Classes**

147.    Gasoline and diesel fuel consumers in the U.S., like Plaintiffs and the proposed Class members, typically purchase gasoline and diesel fuel from gas stations.  Approximately 54% of the U.S. price of gasoline is comprised of the price of crude oil used in the manufacturing process.[198]  Consequently, as recognized by the U.S. Energy Information Administration, "[r]etail gasoline prices are mainly affected by crude oil prices . . . ."[199]

148.    Indeed, Defendants' own trade association, the American Petroleum Institute admits that "the price of crude oil is the primary determinant of the price we pay at the pump"[200] and that "[n]ationwide on a quarterly basis, crude oil prices have explained more than 90% of the variation in [U.S.] gasoline prices since 2020."[201]

149.    Further, while gasoline and diesel fuel prices charged to end-payors are often quick to absorb price increases of oil, they tend to react distinctly slower when oil prices decrease.[202]  This asymmetrical pass-through dynamic, referred to as "rockets and feathers," reveals the

---

[198]    *The Four Main Factors that Influence U.S. Gas Prices*, U.S. DEP'T OF ENERGY (last accessed Jan. 12, 2024), https://www.energy.gov/sites/default/files/2023-04/GasPriceFactors2.jpg.  The remainder of gasoline prices are driven by distribution and marketing costs (16%), refining costs (14%) and taxes (16%).

[199]    *Gasoline explained: Gasoline price fluctuation*, U.S. ENERGY INFO. ADMIN. (last updated Apr. 19, 2023), https://www.eia.gov/energyexplained/gasoline/price-fluctuations.php#:~:text=Gasoline%20%20 prices%20generally%20follow%20crude%20oil%20prices.&text=Gasoline%20prices%20tend%20to%20increase,expected%20gasoline%20demand%20or%20consumption.

[200]    *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Prices*, AM. PETROLEUM INST., (last accessed Jan. 12, 2024), https://www.api.org/oil-and-natural-gas/energy-primers/gas-prices-explained#:~:text=The%20primary%20factors%20impacting%20gasoline, gasoline%20retailers%20pay%20to%20distributors.

[201]    *Id.*; *see also Factors that impact gas prices*, NACS (Apr. 05, 2023) https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon ("Retail gasoline prices move an estimated 2.4 cents per gallon for every $1 change in the price per barrel [of crude oil].").

[202]    Matthew Chesnes, *Asymmetric Pass-Through in U.S. Gasoline Prices*, THE ENERGY J., Vol. 1, at 154, 157 (2016), https://www.iaee.org/en/publications/init2.aspx?id=0.

immediate yet enduring impact of Defendants' artificially inflated gasoline and crude oil derivative fuel product prices on Plaintiffs and the proposed members of the Class.[203]

150.    Plaintiffs confirmed this relationship by conducting their own preliminary regression analysis of monthly U.S. gasoline prices between 2001 and 2023, in which monthly refiner acquisition crude oil prices was the only variable.[204]  This regression returned an R-square of 90%.[205]  Put another way, between 2001 and 2023, Plaintiffs' preliminary regression found that 90% of gasoline price variations in the U.S. can be explained by the prevailing crude oil price.

151.    That crude oil prices drive gasoline and diesel fuel prices is not surprising when one considers how crude oil moves through the supply chain from Defendants to consumers. Defendants and other producers of crude oil sell crude oil to refineries, who use chemical separation and reaction processes to convert crude oil into gasoline and other products (*e.g.*, diesel oil, jet fuel, and other manufacturing feedstocks).  The refineries then transport the gasoline to bulk terminal storage facilities.  Because crude oil is the main raw material used to refine gasoline sold in the United States, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline at artificially inflated levels.

---

[203]    *See* Sun, et al., *Asymmetric pass-through of oil prices to gasoline prices with interval time series modelling*, ENERGY ECONOMICS, Vol. 78 (2018) (collecting studies that indicate the asymmetric price pass-through relationship between crude oil prices and gasoline prices), https://doi.org/10.1016/j.eneco.2018.10.027.

[204]    A regression analysis is a statistical method that describes the relationship between two or more variables.  The regression method tests the relationship between a dependent variable (here gasoline prices) against independent variables (here crude oil prices).  Plaintiffs used the "Refiner Acquisition Cost of Crude Oil" and "Weekly Retail Gasoline" data series maintained by the U.S. Energy Information Administration.

[205]    R-square is a statistical measure in a regression model that determines the proportion of the variance in the dependent or "response" variable (gasoline price) that can be explained by the independent variable or "mean" (crude oil prices paid by refiners).  A R-square of 0% represents a model that does not explain any of the variation in the response variables around the mean and a R-square of 100% represents a model that explains all the variation in the response on the mean.

**Figure 14. U.S. Gasoline Supply Chain**



152.    Gas stations purchase gasoline and diesel fuel wholesale from refineries (or other gasoline marketers who have purchased from the refineries) at a price that is directly tied to the price that was paid by refineries for crude oil, including crude oil sold to those refineries by Defendants.  Gas stations set the price of retail gasoline and diesel fuel above the rack rate they pay, therefore passing on to Plaintiffs and Class members any increase in the rack price.  Indeed, the National Association of Convenience Stores, a body which represents American gas stations, has confirmed that gas stations mark up the price they pay for gasoline by 35 cents a gallon on average when setting the price at the pump.[206]  This can be seen in Figure 15 immediately below, which shows that U.S. gas prices follow the prices paid by U.S. refineries for crude oil.

---

[206]    Lenard, *supra* n.2.

**Figure 15.  Refiners Crude Oil Acquisition Costs vs U.S. Average Gasoline Prices at Rack and Retail (Adjusted for Inflation)**



153.    Therefore, the price of crude oil has a direct effect on the price of gasoline and diesel fuel.[207] Because crude oil is the main raw material used to refine gasoline sold in the United States, and because changes in crude oil prices drove changes in gasoline and diesel fuel prices paid by Plaintiffs and members of the Classes throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline and diesel fuel at artificially inflated levels.

---

[207]    Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html (In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too little" of their "record profits" to ramp up domestic production and "used those record profits to buy back their own stock, rewarding their CEOs.").

**D.    Defendants' Agreement to Constrain Shale Oil Production Has Also Inflated the Price of the Other Crude Oil Derivative Fuel Products Purchased by Plaintiffs and the Class**

154.    As noted above, other crude oil derivative fuel products follow similar paths as gasoline from well to market.  Because the principal raw material input is the same (crude oil), and the manufacturing processes are similar, the price of crude oil has a direct effect on the price of crude oil derivative fuel products.  As a result, Defendants' conspiracy not only inflated the price of crude oil, gasoline, and diesel fuel, but it inflated the price of other crude oil derivative fuel products sold in the United States during the Class Period as well.

**1.  Marine Fuel**

155.    Marine fuel purchasers in the U.S. purchase marine fuel from fuel docks.  Approximately 50% of the price of gasoline sold at fuel docks in the U.S. is comprised of the price of crude oil used in the manufacturing process, with other cost components covering refining, taxes, and distribution and marketing.  For diesel fuel, crude oil represents a similar percentage of the price at the dock.

156.    Fuel dock operators purchase gasoline and diesel from refiners (or other gasoline marketers who have purchased from the refineries) at a price that is directly linked to the price that was paid by refineries for crude oil, including crude oil sold to those refineries by Defendants.  Fuel dock operators set the price of gasoline and diesel sold to end-users above the price they pay, thereby passing on to certain Plaintiffs and members of the Classes any increase in the price of marine fuel.  Figure 16 below, which shows that U.S. gas prices follow the prices paid by U.S. refineries for crude oil, illustrates this dynamic.

157.    Costs of refining, taxes, distribution, and marketing do not fluctuate often, whereas the price of crude oil is actively traded in financial markets and moves constantly, often experiencing large swings.

158.    Because crude oil is the primary raw material used to refine marine fuel sold in the United States, and because changes in crude oil prices drove changes in marine fuel prices paid by certain Plaintiffs and members of the Classes throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase marine fuel at artificially inflated levels.  Indeed, end-user purchasers, who are members of the Classes here, bear much of the brunt of these artificially inflated marine fuel prices.

## 2.  Heating Oil

159.    Most heating oil is supplied by United States refineries that send heating oil to storage terminals for distribution to consumers.[208]  Heating oil is generally transported by rail or barge to larger storage facilities and then transported by truck to smaller storage tanks for sale to customers, who typically have heating oil delivered directly to their home.[209]

160.    According to the EIA, "[n]early all of the heating oil consumed in the United States is produced from crude oil."[210] Accordingly, the cost of crude oil is one of the primary drivers of heating oil prices,[211] as it accounts for just under half the average price of heating oil.[212]  As noted by one website, "[h]eating oil is derived from crude oil, so the price of crude oil has a major effect on the price of heating oil."[213]

---

[208]    *Heating oil explained - Where our heating oil comes from*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 19, 2013), https://www.eia.gov/energyexplained/heating-oil/where-our-heating-oil-comes-from.php.

[209]    *Id.*

[210]    *Heating Oil Explained*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 19, 2023), https://www.eia.gov/energyexplained/heating-oil/.

[211]    *Heating oil explained - Heating oil prices and outlook*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 13, 2023), https://www.eia.gov/energyexplained/heating-oil/prices-and-outlook.php.

[212]    *Heating oil explained - Factors affecting heating oil prices*, U.S. ENERGY INFO. ADMIN. (last updated Oct. 19, 2023), https://www.eia.gov/energyexplained/heating-oil/factors-affecting-heating-oil-prices.php.

[213]    Lawrence Pines, *Heating Oil: How Is This Crucial Energy Commodity Made?*, COMMODITY.COM (last updated Mar. 22, 2022), https://commodity.com/energy/heating-oil/.

161.    As demonstrated by Figure 16 below, prices paid by consumers for heating oil closely mirror the prices both for crude oil and gasoline sold in the United States.

**Figure 16. Heating Oil vs. Gasoline vs. Crude Oil Spot Prices**



162.    Because crude oil is the primary raw material used to refine heating oil sold in the United States, and because changes in crude oil prices drove changes in heating oil prices paid by certain Plaintiffs and members of the Classes throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase heating oil at artificially inflated levels.  Indeed, end-user purchasers, who are members of the Classes here, bear much of the brunt of these artificially inflated heating oil prices.

### 3.  Jet Fuel

163.    Jet fuel purchasers buy jet fuel at airports.  The vast majority of airline fuel used by U.S. airlines is jet fuel, which is a kerosene-based crude oil derivative fuel product.

164.    Crude oil is the main input into jet fuel.  Therefore, the price of jet fuel is greatly affected by the global price of crude oil.  Figure 17 below shows New York jet fuel prices against Brent crude oil prices from 2019-2021.  Jet fuel's prevailing price before the COVID-19 pandemic was around $20/Bbl over Brent, but the changes in jet fuel and crude oil prices were almost identical on a daily or weekly basis.

**Figure 17. New York Jet Fuel Prices Against Brent Crude Oil Prices (2019-2021)**



165.    Because crude oil is the primary raw material used to refine jet fuel sold in the United States, and because changes in crude oil prices drove changes in jet fuel prices paid by certain Plaintiffs and members of the Classes throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase jet fuel at artificially inflated levels.  Indeed, end-user purchasers, who are members of the Classes here, bear much of the brunt of these artificially inflated jet fuel prices.

## VIII.   CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil

Procedure 23(a), (b)(1), and (b)(2) as representatives of a Class of end-payors seeking injunctive

relief ("Nationwide Injunctive Relief Class") defined as:

> All persons and non-governmental entity end purchasers of crude oil derivative fuel
> products in the United States from January 1, 2021 and until Defendants' unlawful
> conduct and its anticompetitive effects cease to persist.

167.    Plaintiffs also bring this action on behalf of itself and all others similarly situated

as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as

well as equitable relief, on behalf of the following Class ("State Law Class"):

> All persons and non-governmental entity end purchasers of crude oil derivative fuel
> products in Alabama, Arizona, California, Colorado, Connecticut, the District of
> Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland,
> Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada,
> New Hampshire, New Jersey, New Mexico, New York, North Carolina, North
> Dakota, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Utah,
> Vermont, West Virginia, and/or Wisconsin from January 1, 2021 and until
> Defendants' unlawful conduct and its anticompetitive effects cease to persist.

168.    For these Classes, crude oil derivative fuel products means gasoline, distillate fuel

(including diesel fuel and home heating oil), marine fuel, and jet fuel.

169.    Specifically excluded from these Classes are Defendants; the officers, directors, or

employees of any Defendant; any entity in which any Defendant has a controlling interest; and any

affiliate, legal representative, heir, or assign of any Defendant.  Also excluded from both Classes

are any federal, state, or local governmental entities, any judicial officer presiding over this action

and the members of his/her immediate family and judicial staff, any juror assigned to this action,

and any co-conspirator identified in this action.

170.    Both Classes are so numerous as to make joinder impracticable.  Plaintiffs do not

know the exact number of Class members but the above-defined Classes are readily identifiable

and are ones for which records should exist. Plaintiffs believe that due to the nature of the product market, there are at least millions of members of both Classes in the United States.

171.     Common questions of law and fact exist as to all members of both Classes. Plaintiffs and the members of both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes. Common issues of fact and law include, but are not limited to, the following:

  a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or crude oil derivative fuel products in the United States;

  b. the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

  c. whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;

  d. whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Classes;

  e. whether Defendants caused Plaintiffs and members of the Classes to suffer damages in the form of overcharges on crude oil derivative fuel products;

  f. the effect of Defendants' alleged conspiracy on the prices of crude oil derivative fuel products sold in the United States during the Class Period;

  g. the appropriate Class-wide measure of damages; and

  h. the nature of appropriate injunctive relief to restore competition in the U.S. market for crude oil derivative fuel products.

172.     Plaintiffs' claims are typical of the claims of members of the Classes, and Plaintiffs will fairly and adequately protect the interests of both Classes. Plaintiffs and all members of both

Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for crude oil derivative fuel products sold in the U.S., resulting from price-fixing in the crude oil market by cartel members.

173.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

174.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

175.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

176.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

177.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX.    CLAIMS FOR RELIEF

**E.    VIOLATION OF THE SHERMAN ACT**

<u>**COUNT 1**</u>
**VIOLATION OF 15 U.S.C. §1**
**(On Behalf of the Nationwide Injunctive Relief Class)**

178.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

179.    From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and stabilize the price for crude oil and crude oil derivative fuel products in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

180.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, which resulted in the fixing, raising, and stabilizing of the price of crude oil and crude oil derivative fuel products.

181.    The combination and conspiracy alleged herein has had the following effects, among others:

      a.    Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

      b.    Prices for crude oil sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States; and

      c.    Those who purchased crude oil derivative fuel products indirectly from Defendants and their co-conspirators for their personal use have been

deprived of the benefits of free and open competition, and paid artificially high prices for crude oil derivative fuel products.

182.    Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses and property by paying more for crude oil derivative fuel products purchased indirectly from Defendants and their co-conspirators than they would have paid (and will continue to pay) in the absence of the combination and conspiracy.

183.    Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**F.    VIOLATIONS OF STATE ANTITRUST LAWS**

184.    Plaintiffs repeat and reiterate the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

185.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states.  The result of this caused an unreasonable restraint on trade and commerce and harmed consumers in violation of the various state antitrust and consumer protection laws set forth below.

186.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes; exchanging competitively sensitive information between and among Defendants; and participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements reached between them.

187.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels.  As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase crude oil derivative fuel products than they otherwise would have in the absence of Defendants' unlawful conduct.  This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

188.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

189.    Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

190.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

191.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

## COUNT 2: ARKANSAS
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Alabama)**

192.    Due to Defendants' unlawful conduct, (1) competition for crude oil and gasoline was restrained, suppressed, and eliminated within Arkansas; (2) crude oil derivative fuel product prices in the State of Arkansas were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  Defendants' agreement to restrain trade is an unconscionable, false, or deceptive act in violation of the Arkansas Deceptive Trade Practices Act, ARK. CODE §4-88-101 *et seq*.  Defendants' conspiracy substantially affected Arkansas commerce and accordingly, Plaintiffs and the members of the Class that reside in and/or purchased gasoline and/or other crude oil derivative fuel products in Arkansas seek all forms of relief available under ARK. CODE §4-88-101 *et seq*.

## COUNT 3: ALABAMA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Alabama)**

193.    Due to Defendants' unlawful conduct, (1) competition for crude oil and gasoline was restrained, suppressed, and eliminated within Alabama; (2) crude oil derivative fuel product prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*.  Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

## COUNTS 4 & 5: ARIZONA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Arizona)**

194.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout Arizona; (2) price of crude

oil derivative fuel products in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

195. Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

196. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. ANN. §44-1521 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 6 & 7: CALIFORNIA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in California)**

197. Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout California; (2) crude oil derivative fuel product prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

198. Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each Defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of domestic shale oil. For the purpose of forming and

effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of gasoline.  As a result of Defendants' violation of CAL. BUS. & PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

199.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE §17200 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## <u>COUNTS 8 & 9: COLORADO</u>
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Colorado)

200.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout Colorado; (2) crude oil derivative fuel product prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

201.    Defendants have violated COLO. REV. STAT. §6-4-101 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under violated COLO. REV. STAT. §6-4-101, *et seq.*

202.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of COLO. REV. STAT. §6-1-101 *et seq.* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 10: CONNECTICUT
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Connecticut)

203.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CONN. GEN. STAT. §35-24 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout Connecticut, and (2) crude oil derivative fuel product prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of CONN. GEN. STAT. §35-24 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under CONN. GEN. STAT. §35-24 *et seq*.

## COUNTS 11 & 12: DISTRICT OF COLUMBIA
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in District of Columbia)

204.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the District of Columbia; (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased gasoline in the District of Columbia, paid supracompetitive, artificially inflated prices for gasoline.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

205.    Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

206.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 13: FLORIDA
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Florida)

207.    Through their actions and actions of co-conspirators, crude oil and gasoline prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, competition in the gasoline market was restrained, suppressed, and eliminated throughout Florida.  Plaintiffs and members of the Class, including those who purchased gasoline in the State of Florida, paid supracompetitive, artificially inflated prices for crude oil derivative fuel products.  During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

208.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. §501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 14: HAWAII
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Hawaii)

209.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions.  *See* HAW. REV. STAT. §§480-4, 480-13.  Through Defendants' actions and the actions of their co-conspirators, gasoline prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Hawaii.  Plaintiffs and members of the Class, including those who resided in the State of Hawaii and purchased gasoline in Hawaii, paid supracompetitive, artificially inflated prices for their crude oil derivative fuel products.  During the Class Period, Defendants' illegal

conduct substantially affected commerce in Hawaii.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq*.

## COUNTS 15 & 16: ILLINOIS
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Illinois)

210.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil and gasoline market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois.  During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

211.    Defendants have entered into agreements in restraint of trade in violation of 740 ILL. COMP. STAT. 10/1 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 ILL. COMP. STAT. 10/1 *et seq*.

212.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/1 *et seq*, and 720 ILL. COMP. STAT. 295/1a, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 17: IOWA
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Iowa)

213.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) crude oil derivative fuel product prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation

of Iowa Code §553.1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

## COUNT 18: KANSAS
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Kansas)

214.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. §50-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Kansas; (2) crude oil derivative fuel product prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.    Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kan. Stat. Ann. §50-101 *et seq.*

## COUNT 19: MAINE
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Maine)

215.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. tit. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Maine; and (2) crude oil derivative fuel product prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.    Accordingly, Plaintiffs and members of the Class seek all relief available under Me. Stat. tit. 10, §1104.

## COUNTS 20 & 21: MARYLAND
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Maryland)

216.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for crude oil derivative fuel products by restraining,

suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil derivative fuel product prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

217. Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq*.

218. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE ANN., COM. LAW §13-101 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 22: MASSACHUSETTS
### (On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Massachusetts)

219. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil derivative fuel products was restrained, suppressed, and eliminated throughout the State of Massachusetts, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Massachusetts. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

220. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MASS. GEN. LAWS ANN., Ch. 93A §1, *et seq.* by entering into unlawful agreement in restraint of trade in the State of Massachusetts and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 23 & 24: MICHIGAN

**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Michigan)**

221.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq*.

223.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS §445.903 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 25 & 26: MINNESOTA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Minnesota)**

224.    Through their actions and actions of co-conspirators, gasoline prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiffs and members of the Class, including those who resided in the State of Minnesota and purchased gasoline there, paid supracompetitive, artificially inflated prices for crude oil derivative fuel products. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

225.    Defendants have violated the MINN. STAT. §325D.49 *et seq*., through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under MINN. STAT. §325D.49 *et seq*.

226.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MINN. STAT. MINN. STAT. § 325d.43-48 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 27: MISSISSIPPI
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Mississippi)**

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE ANN. §75-21-1 *et seq*. *See* MISS. CODE ANN. §75-57-63.  Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi.  During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce.  Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-57-63.

### COUNT 28: MONTANA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Montana)**

228.    By reason of the conduct alleged herein, Defendants have violated MONT. CODE, §§30-14-101, *et seq.* Defendants' unlawful conduct had the following effects: (1) crude oil derivative fuel product price competition was restrained, suppressed, and eliminated throughout Montana; (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for crude oil derivative fuel products.

229.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs were injured and are threatened with further injury.  Accordingly, Plaintiffs and members of the Class seek all relief available under the Montana Consumer Protection Act of 1973, MONT. CODE, §§30-14-101, *et seq*.

### COUNTS 29 & 30: NEBRASKA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Nebraska)**

230.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

231.    Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

232.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. §59-1601 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 31 & 32: NEVADA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Nevada)**

233.    Defendants' conspiracies had the following effects: (1) price competition for crude oil and gasoline was restrained, suppressed, and eliminated throughout the State of Nevada; (2) crude oil derivative fuel product prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

234.    Defendants violated the NEV. REV. STAT. ANN. §598A.210 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of NEV. REV. STAT. ANN. §598A.210 *et seq*. Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to NEV. REV. STAT. ANN. §598A.210.

235.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. §598.0903 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## <u>COUNTS 33 & 34: NEW HAMPSHIRE</u>
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in New Hampshire)**

236.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil and crude oil derivative fuel product market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil derivative fuel product prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

238.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. §358-A:1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 35: NEW JERSEY
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in New Jersey)**

239.    Defendants' conspiracy detrimentally affected the price competition for crude oil derivative fuel products purchased in the State of New Jersey by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil derivative fuel product prices in the State of New Jersey at artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

240.    Defendants engaged in a conspiracy in restraint of the trading of PVC Pipe in violation of the New Jersey Antitrust Act, N.J. STAT. ANN. §56:9-3.  Accordingly, Plaintiffs and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction.  N.J. STAT. ANN. §56:9-12.

## COUNTS 36 & 37: NEW MEXICO
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in New Mexico)**

241.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for crude oil and crude oil derivative fuel product by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil derivative fuel product prices in the State of New Mexico at artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

242.    Defendants violated the N.M. STAT. ANN. §57-1-1 *et seq.,* by entering into unlawful agreement in restraint of trade in the State of New Mexico.  Accordingly, Plaintiffs and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

243.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. §57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 38: NEW YORK
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in New York)**

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of New York, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York.  During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce.  The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

### COUNT 39: NORTH CAROLINA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in North Carolina)**

245.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) crude oil derivative fuel product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina.  During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce.  Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq.*

## COUNT 40: NORTH DAKOTA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in North Dakota)**

246.     Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq.* through their anticompetitive actions.  Through their actions and actions of co-conspirators, crude oil derivative fuel product prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition in the market for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of North Dakota.  Plaintiffs and members of the Class, including those who resided in the State of North Dakota and purchased crude oil derivative fuel product there, paid supracompetitive, artificially inflated prices.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq.*

## COUNTS 41 & 42: OREGON
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Oregon)**

247.     Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of Oregon; (2) crude oil derivative fuel product prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

248.     Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq.*

249.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. §646.605 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 43: PENNSYLVANIA**
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Pennsylvania)**

250.    Through their actions and actions of Co-Conspirators, crude oil derivative fuel product prices in the State of Pennsylvania were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the crude oil derivative fuel product markets was restrained, suppressed, and eliminated throughout Pennsylvania.  Plaintiffs and members of the Class, including those who Purchased crude oil derivative fuel products in the State of Pennsylvania, paid supracompetitive, artificially inflated prices for crude oil derivative fuel products. During the Class Period, Defendants' illegal conduct substantially affected commerce in Pennsylvania.

251.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 P.S. §201-1, *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNTS 44 & 45: RHODE ISLAND**
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Rhode Island)**

252.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for crude oil and crude oil derivative fuel product by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil derivative fuel product prices in the State of Rhode Island at artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. GEN. LAWS §6-36-7 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all relief available under R.I. GEN. LAWS §6-36-7 *et seq*.

254.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

<u>**COUNTS 46 & 47: SOUTH DAKOTA**</u>
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in South Dakota)**

255.    Through their actions and actions of co-conspirators, crude oil derivative fuel product prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class.  Throughout the Class Period, price competition in the market for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of South Dakota.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased crude oil derivative fuel product there, paid supracompetitive, artificially inflated prices for their crude oil derivative fuel products.

256.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq*., through their anticompetitive actions.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq*.

257.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS §37-24-1 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 48: TENNESSEE
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Tennessee)**

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of crude oil derivative fuel product, a tangible good, was restrained, suppressed, and eliminated throughout the State of Tennessee; and (2) individuals have been deprived of free and open competition.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq*.

## COUNT 49: UTAH
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Utah)**

259.    Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq*. by entering into unlawful agreement in restraint of trade in the State of Utah.  Specifically, Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for crude oil and crude oil derivative fuel product by restraining, suppressing, and eliminating competition.  Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized crude oil derivative fuel product prices in Utah at artificially high levels.  During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah.  Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq*.

## COUNT 50: VERMONT
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Vermont)**

260.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil and crude oil derivative fuel product was restrained, suppressed, and eliminated throughout the State of Vermont; (2) crude oil derivative fuel product prices in the State

of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq*.

### COUNT 51: WEST VIRGINIA
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in West Virginia)**

261.    Defendants' conspiracy had the following effects: (1) price competition for crude oil derivative fuel products was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) crude oil derivative fuel product prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of W. VA. CODE §47-18-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under W. VA. CODE §47-18-1 *et seq*.

### COUNT 52: WISCONSIN
**(On Behalf of Class Members that Purchased Crude Oil Derivative Fuel Products in Wisconsin)**

263.    Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of WIS. STAT. §133.03(1). Defendants' conspiracy had the following effects: (1) price competition for crude oil derivative fuel products was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) crude oil derivative fuel product prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

264.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under WIS. STAT. §133.03.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes of all others so similarly situated, respectfully requests that:

A.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiffs as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

B.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

C.    The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Classes for treble the amount of damages sustained by Plaintiffs and the Classes as allowed by law, together with costs of the action, including reasonable

attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

      E.      The Court award Plaintiffs and members of the Classes such other and further relief as the case may require and that the Court may deem just and proper under the circumstances.

## XI.      JURY TRIAL DEMANDED

Plaintiffs demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Date: January 7, 2025              */s/ Christopher A. Dodd*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Patrick J. Coughlin (*pro hac vice*)
Carmen Medici (*pro hac vice*)
Daniel J. Brockwell (*pro hac vice*)
Isabella De Lisi (*pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
pcoughlin@scott-scott.com
cmedici@scott-scott.com
dbrockwell@scott-scott.com
idelisi@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Patrick McGahan (*pro hac vice*)
Michael Srodoski (*pro hac vice*)
Zachary Kranc (*pro hac vice*)
156 S Main Street
P.O. Box 192
Colchester, CT 06415
Tel: (860) 537-5537
pmcgahan@scott-scott.com
msrodoski@scott-scott.com
zkranc@scott-scott.com

**DODD LAW OFFICE, LLC**
Christopher A. Dodd
500 Marquette Avenue NW, Suite 1330
Albuquerque, New Mexico 87102
Tel: (505) 475-2932
chris@doddnm.com

**THE WARD LAW FIRM**
Vincent J. Ward
PO Box 7940
Albuquerque, NM 87194
Tel: (505) 944-9454
vincent@wardlawnm.com

**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
Gregory P. Hansel (*pro hac vice*)
Michael S. Smith (*pro hac vice*)
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Tel: (207) 791-3000
ghansel@preti.com
msmith@preti.com

**KOHN SWIFT & GRAF, P.C.**
Joseph C. Kohn (*pro hac vice*)
1600 Market Street, Suite 2500

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Karin E. Garvey (*pro hac vice*)
230 Park Ave., 24th Floor
New York, NY 11069
Tel: (212) 223-6444
kgarvey@scott-scott.com

**BURNS CHAREST LLP**
Warren T. Burns (*pro hac vice*)
Daniel H. Charest (*pro hac vice*)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com

**BURNS CHAREST LLP**
Korey Nelson (*pro hac vice*)
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Tel: (504) 799-7845
knelson@burnscharest.com

Philadelphia, PA 19103
Tel: (215) 238-1700
jkohn@kohnswift.com

**KENNEDY HERNANDEZ & HARRISON, PC**
Paul J. Kennedy
Jessica M. Hernandez
201 12th St. NW
Albuquerque, NM 87102-1815
Tel: (505) 842-8662
pkennedy@kennedyhernandez.com
jhernandez@kennedyhernandez.com

**LAPAYOWKER JET COUNSEL, P.A.**
Stewart H. Lapayowker (*pro hac vice*)
501 E. Las Olas Blvd., Suite 300
Fort Lauderdale, FL 33301
Tel: (954) 202-9600
Stewart@JetCounsel.Law